**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION**

| | | |
|---|---|---|
| Phillips and Jordan, Inc., | ) | Civil Action No. 5:18-cv-00559-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **TRIAL ORDER AND OPINION, FINDINGS** |
| | ) | **OF FACT, AND CONCLUSIONS OF LAW** |
| McCarthy Improvement Company; | ) | |
| Western Surety Company, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I. INTRODUCTION

This action arises from a contract dispute between Plaintiff Phillips and Jordan, Inc., ("P&J") and Defendants McCarthy Improvement Company ("MCI") and Western Surety Company ("WSC") (together "Defendants").[1]

## II. PROCEDURAL HISTORY

1.      P&J filed a Complaint against MCI and WSC on February 27, 2018, seeking damages arising from a highway construction project in Orangeburg, South Carolina (the "Santee Project"). (ECF No. 1.)

2.      After Defendants filed a Motion to Dismiss for failure to state a claim pursuant to Rules 12(b)(4), 12(b)(5), 12(b)(6), and 12(b)(7) of the Federal Rules of Civil Procedure (ECF No. 7 at 2), P&J submitted an Amended Complaint on June 1, 2018, alleging five claims against MCI: (1) Breach of Contract; (2) Quantum Meruit or Unjust Enrichment; (3) Violation of South

---

[1] The court notes that, as to citations in this Order, "ECF No." refers to a filing on the court's electronic docket; "Trial Tr." refers to the uncertified trial transcript, which includes the specific trial date; "Pl. Ex. No." refers to the specified trial exhibit of P&J; "Def. Ex. No." refers to the specified trial exhibit of MCI and WSC; and "Ct. Ex. No." refers to the specified court trial exhibit.

Carolina's Prompt Pay Act, S.C. Code Ann. § 29-6-30 (West 2020); (4) Recovery of Attorney's Fees and Interest for Improvement of Real Estate, § 27-1-15 (West 2020); and (5) Breach of Payment Bond; as well as two claims against WSC for: (1) Recovery of Attorney's Fees and Interest for Improvement of Real Estate; and (2) Breach of Payment Bond. (ECF No. 11 at 11–15.) Defendants withdrew the Motion to Dismiss on June 4, 2018. (ECF No. 12.)

3.     On June 15, 2018, Defendants filed an Answer and Counterclaim against P&J, asserting a claim for breach of contract against P&J. (ECF No. 18 at 17.)

4.     P&J Answered Defendants' Counterclaim on July 2, 2018. (ECF No. 25.)

5.     P&J filed a Motion for Partial Summary Judgment on October 15, 2019. (ECF No. 83.)

6.     On the same day, Defendants filed a Motion for Partial Summary Judgment (ECF No. 84) as to P&J's breach of contract claim and a Motion for Partial Summary Judgment as to their Counterclaim against P&J for breach of contract (ECF No. 85).

7.     The court issued an Order denying the parties' respective Motions for Partial Summary Judgment. (ECF No. 130.)

8.     Thereafter, the court conducted a bench trial starting on December 2, 2019, through December 6, 2019, continuing on December 16, 2019, through December 19, 2019, and concluding January 27, 2020, through January 31, 2020. (ECF Nos. 132–133, 135–137, 141–142, 144–145, 149–153.)

9.     The court received two deposition transcripts (ECF Nos. 143, 146) and a video deposition[2] (ECF Nos. 154, 166), and it heard live testimony from seventeen (17) witnesses:

---

[2] Defendants proffered a video deposition of Frances Harrison, who was originally P&J's designated Expert Witness for testimony regarding soil quality, to show that the material on-site was of sufficient quality and that P&J's poor workmanship caused delays. (ECF No. 166.)

P&J's witnesses:

a. Claude Ray Ipock, South Carolina Department of Transportation ("SCDOT") Engineer and Design-Build Manager on the Santee Project. (Trial Tr. at 72: Dec. 2.)

b. Walter Minor, P&J equipment operator on the Santee Project. (Trial Tr. at 100: Dec. 3.)

c. David Edward "Edd" Satterfield, P&J's Vice President. (Trial Tr. at 123: Dec. 3.)

d. William O'Dell, P&J employee on the Santee Project. (Trial Tr. at 99: Dec. 4.)

e. Joseph Ledford, P&J's First Project Superintendent on the Santee Project. (Trial Tr. at 146: Dec. 4.)

f. Aaron Stewart, P&J's Surveyor on the Santee Project. (Trial Tr. at 70: Dec. 5.)

g. John L. Tompkins, Expert Witness on quantities, schedules, and damages. (Trial Tr. at 123: Dec. 5.)

h. Randy Lynn, P&J's Project Superintendent on the Santee Project. (Trial Tr. at 1: Dec. 16.)

i. Warren Dudley Orr, Project Executive for P&J. (Trial Tr. at 138: Dec. 16.)

j. J. Patrick McMullen, President of P&J. (Trial Tr. at 19: Dec. 19.)

Defendants' witnesses:

k. Christian Gibson, Expert Witness on construction surveying. (Trial Tr. at 111: Dec. 19.)

l. Bryon Willoughby, Expert Witness on construction schedules and the "final quantity" calculation. (Trial Tr. at 12: Jan. 27; Trial Tr. "B" at 21: Jan. 30.)

m. Gregory J. Bush, MCI's Chief Operating Officer and President. (Trial Tr. "A" at 43: Jan. 28.)

n. Ronald Sines, retired MCI Executive Vice President. (Trial Tr. "A" at 98: Jan. 28.)

o. David Boyer, MCI's Project Manager on the Santee Project. (Trial Tr. "A" at

5: Jan. 29.)

    p.   Joseph Bush, MCI's Chief Operating Officer. (Trial Tr. "B" at 52: Jan. 30.)

    q.   Alan Sweat, MCI's Southeast Division Manager on the Santee Project. (Trial Tr. "A" at 74–75: Jan. 31.)

10.    The parties stipulated to the admission of the expert witness reports (Pl. Ex. Nos. 135, 205; Def. Ex. No. 2), and the court granted the parties' request to present witnesses out of order pursuant to Rule 611 of the Federal Rules of Evidence to facilitate efficiency through the examination of the witnesses for the parties' cases-in-chief. *See* Fed. R. Evid. 611(a)(1)–(3).

11.    Following the bench trial, the parties filed written closing arguments to the court. (ECF Nos. 161, 162.)

12.    After reviewing the testimony, carefully considering all of the evidence, weighing the credibility of the witnesses, evaluating the exhibits, and studying the applicable law, the court makes the following Findings of Fact and Conclusions of Law, in accordance with Rule 52 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.") To the extent any Findings of Fact constitute Conclusions of Law, they are adopted as such; to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

### III. FINDINGS OF FACT

#### A.  The Parties

1.    P&J is organized under the laws of North Carolina and has a principal place of business in Tennessee. (ECF Nos. 11, 18; Pl. Ex. No. 207 at 1.)

2.    P&J specializes in Heavy Civil Infrastructure Construction, Right-of-Way (ROW), and Disaster Response. PHILLIPS & JORDAN, INC., https://pandj.com/disciplines/ (last visited May

4, 2020).

3.      MCI is organized under the laws of, and has a principal place of business in, Iowa. (*Id.*)

4.      MCI specializes in Heavy Highway, Aviation, Industrial, and Commercial Construction. MCCARTHY IMPROVEMENT CO., https://www.mccarthyimprovement.com/ (last visited May 4, 2020).

5.      WSC is organized under the laws of, and has a principal place of business in, South Dakota. (*Id.*)

6.      WSC "provides a full range of surety and fidelity bonds in all [fifty] (50) states, Canada[,] and Puerto Rico." CNA SURETY, https://www.cnasurety.com/cna/guest/cnasurety/ (last visited May 4, 2020).

**B.  The Prime Contract**

7.      On March 15, 2013, SCDOT issued a request for proposals to design and construct a highway interchange between Interstate 95 and U.S. Route 301 in Orangeburg County, South Carolina. (Def. Ex. No. 89; Trial Tr. at 87–88: Dec. 2.)

8.      MCI's total adjusted bid of thirty-three million, one hundred eleven thousand, seven hundred dollars, and zero cents ($33,111,700.00) was four million, two hundred fourteen thousand, five hundred twenty-four dollars, and zero cents ($4,214,524.00) lower than any other bid. (Pl. Ex. No. 389-A.)

9.      MCI bid four hundred forty (440) days to complete the Santee Project, which was one hundred fifty-five (155) days sooner than any other bid. (*Id.*)

10.     Under South Carolina law, MCI had to provide SCDOT with "design requirements," which "means the written description of the infrastructure facility to be procured

pursuant to this article, including: (1) required features, functions, characteristics, qualities, and properties that are required by the State; (2) the anticipated schedule, including start, duration, and completion; and (3) estimated budgets as applicable to the specific procurement, for design, construction, operation, and maintenance."[3] S.C. Code Ann. § 11-35-2910(10) (West 2020).

11.    On September 23, 2013, MCI entered into a "Design-Build" contract ("Prime Contract") with SCDOT.[4] (Def. Ex. No. 62 at 1–49.) SCDOT paid MCI a lump sum of thirty million, nine-hundred twenty-five thousand dollars ($30,925,000.00). (*Id.* at 11 ¶ A.)

12.    MCI's scope of work under the Prime Contract provides: "[MCI] shall furnish all services, labor, materials, equipment, supplies, tools, transportation, and coordination required to perform all design, preliminary engineering, surveying geotechnical services, scheduling, permitting, right of way services, procurement, construction, utility coordination, demolition, material disposal[,] and any other services necessary to perform the [Santee] Project[.]" (*Id.* at 6.)

## C. Completion of Project

13.    The Prime Contract defines "Substantial Completion" as follows: "The Project shall be considered substantially complete when it is serviceable to the public, all lanes and ramps are open, and all work is completed except for 'Project Close-out Activities'[;] 'Project Close-out Activities' are defined as punch list items, site clean-up, demobilization, and final Project documentation, including but not limited to as-built plans. (*Id.* at 16.)

14.    "Final Completion" under the Prime Contract is defined as: "When [MCI] believes that all elements of its work on the Project, including all the requirements of the Contract, have

---

[3] SCDOT "Standard Specifications" govern South Carolina construction projects, including how to build every facet of a project. (Trial Tr. "A" at 80: Jan. 29.)
[4] "'Design-Build' is defined as a project delivery method in which the governmental body enters into a single contract for design and construction of an infrastructure facility." S.C. Code Ann. § 11-35-2910(7) (West 2020).

been completed, it shall notify SCDOT in writing." (*Id.* at 18.)

### D. Liquidated Damages

15.    The Prime Contract included a liquidated damages clause, assessing a seven thousand, five hundred dollars, and zero cents ($7,500.00) per day penalty on MCI if the Santee Project failed to reach Substantial Completion and one thousand, five hundred dollars, and zero cents ($1,500.00) each day that Final Completion had not been achieved. (*Id.* at 19 ¶ D; Trial Tr. "A" at 20: Jan. 29.) Under the Prime Contract, "Final Completion shall be achieved within [one hundred eighty] (180) calendar days of Substantial Completion[.]" (*Id.* at 18 ¶ 5.)

### E. Bond

16.    MCI entered into a payment bond agreement with WSC, Bond No. 929580183, for a penal sum of thirty million, nine-hundred twenty-five thousand dollars ($30,925,000.00) in accordance with S.C. Code Ann. § 11-35-3030(2)(A)(ii) (West 2020) ("Bond"). (Def. Ex. No. 62 at 24; ECF No. 1-2 at 1–4.)

17.    In part, the Bond stated that "[t]he Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors[,] and assigns to the Owner to pay for labor, materials[,] and equipment furnished for use in the performance of the Construction Contract[.]" (ECF No. 1-2 at 2–3.)

18.    As such, WSC agreed to be bound jointly and severally with MCI to all persons furnishing labor or materials in the event that MCI failed to make prompt payment to such persons. (*Id.*)

### F. Design and Construction

19.    The Prime Contract defined MCI's "Design and Construction Responsibilities" as follows:

> [MCI], consistent with applicable state licensing laws, shall provide, through qualified South Carolina licensed design professionals employed by [MCI] or procured from qualified, independent South Carolina licensed design consultants, the necessary design work, including, but not limited to, surveys, right of way services, roadway design, maintenance of traffic, geotechnical exploration and design, hydraulic analyses, storm water management, erosion control, superstructure design, and foundation and substructure design including seismic analyses for the preparation of the required drawings, specifications[,] and other design submittals to permit [MCI] to complete the work in accordance with the [Prime Contract].

(Def. Ex. No. 62 at 11.)

20.     The Prime Contract stipulates that: "[MCI] shall prepare and maintain a schedule for the [Santee] Project using the Critical Path Method of scheduling" and "[s]ubmit monthly updates no later than [fifteen] 15 days following the most recent estimate period end date." (*Id.* at 16–17.)

### G. The Subcontract

21.     On October 14, 2014, MCI entered into a unit price subcontract (the "Subcontract") with P&J. (Pl. Ex. No. 30 at 1–53; Def. Ex. No. 461.)

22.     The "unit price" meant that MCI would compensate P&J based on the amount of soil it excavated and placed. (*Id.* at 15.)

23.     The anticipated Subcontract completion date was June 20, 2015. (*Id.*)

24.     The relevant articles of the Subcontract between P&J and MCI are provided verbatim:

> **Article One:** The General Contract, as the term is used herein, also includes all documents appurtenant thereto including, but not limited to (1) Plans, (2) Specifications, (3) Drawings, (4) General and special conditions, and (5) Addenda. The General Contract is hereby made a part of this Agreement. The SUBCONTRACTOR will adhere to and be bound by all the requirements of the General Contract.

> **Article Two:** By the means of this Agreement, the SUBCONTRACTOR does agree to furnish, erect and install all materials and perform all work and in every respect

8

complete the following part of the Project, as defined by the General Contract, items at the Subcontract Unit Prices set forth herein. The quantities, if any, are estimates. Payment hereunder shall be limited to the actual quantities of work installed and accepted by the OWNER, as set forth on the Final Payment Estimate and/or Certification constituting the basis for the Final Payment by the Owner to the CONTRACTOR.

**Article Four:** The SUBCONTRACTOR acknowledges that the SUBCONTRACTOR (1) has examined the site of the proposed work and is familiar with the conditions surrounding same and (2) has examined the plans and drawings and has studied, and is acquainted with, the requirements of the General Contract. The SUBCONTRACTOR will perform and observe all obligations of the CONTRACTOR under the General Contract relating to that portion of the work hereby sublet. SUBCONTRACTOR waives any right to plead any misunderstanding or mistake regarding the circumstances of the job. No additional compensation will be allowed because of SUBCONTRACTOR'S failure to make such examinations.

**Article Five:** The SUBCONTRACTOR understands and agrees that any decision, interpretation, or determination of the said General Contract by said OWNER binding upon the CONTRACTOR, shall be binding also on the SUBCONTRACTOR.

**Article Six:** The SUBCONTRACTOR will promptly begin the work required of him hereunder within 24 hours of verbal notice to proceed as issued by the CONTRACTOR, and the SUBCONTRACTOR will diligently prosecute and complete the said work as rapidly as the CONTRACTOR shall judge that the progress of the work will permit, unless the SUBCONTRACTOR is delayed by other subcontractors of the CONTRACTOR, other prime contractors of the OWNER, or the OWNER. In the event the SUBCONTRACTOR is delayed for these reasons, the SUBCONTRACTOR will promptly notify the CONTRACTOR in writing, who (if satisfied that the delay is caused by other than the SUBCONTRACTOR) will allow additional time sufficient in the CONTRACTOR'S judgment to compensate for the time so lost.

The SUBCONTRACTOR shall complete the several portions, and the whole of the work comprehended in the Agreement by and at the time or times hereinafter stated, to wit:

In accordance with the CONTRACTOR'S approved progress schedule, which is contingent upon a forthcoming production schedule mutually agreed upon by both parties.

The SUBCONTRACTOR agrees that the time allotted hereunder is sufficient for the completion of his work. The SUBCONTRACTOR acknowledges and agrees that any damages, penalties, or injuries sustained by the CONTRACTOR because

of the failure of the SUBCONTRACTOR to complete his work within the time and schedule herein allotted, will be reimbursed to the CONTRACTOR by the SUBCONTRACTOR. Failure of the SUBCONTRACTOR to complete his work within the time and schedule herein allotted shall be conclusive evidence of the SUBCONTRACTOR'S responsibility to the CONTRACTOR for damages sustained. The responsibility of the SUBCONTRACTOR hereunder shall not exceed his proportionate share of the total delay in the completion of the Project, where such total delay in the Project's completion exceeds the time of delay actually attributable to the SUBCONTRACTOR.

**Article Seven:** The CONTRACTOR will make partial payments to the SUBCONTRACTOR for the work performed and materials furnished by the SUBCONTRACTOR as monies are received by the CONTRACTOR from the OWNER. The basis for payment shall be as follows: "The amount of retainage withheld by the CONTRACTOR will be the same amount of retainage withheld by the OWNER." The CONTRACTOR will make payments to the SUBCONTRACTOR within ten (10) working days after receipt of money from the OWNER.

Prior to issuance of any payments by the CONTRACTOR to the SUBCONTRACTOR, CONTRACTOR may request of the SUBCONTRACTOR to furnish to the CONTRACTOR (in a form suitable to the CONTRACTOR) an application for the payment then due together with receipts, waivers of claim, and other evidence showing the SUBCONTRACTOR'S payment for materials, labor and other expenses incurred in the SUBCONTRACTOR'S work hereunder. The percentage so withheld will not be paid to the SUBCONTRACTOR until (10) days after final payment for all work performed hereunder has been made to the CONTRACTOR by the OWNER, and the OWNER has issued to the CONTRACTOR a final acceptance of the project.

The CONTRACTOR may withhold the whole or any part of any payment due to the SUBCONTRACTOR to the extent necessary to protect and indemnify the CONTRACTOR from loss on account of (a) defective work not remedied, (b) claims filed or reasonable evidence indicating probable filing of claims, or (c) failure of the SUBCONTRACTOR to make payments promptly for material or labor.

The SUBCONTRACTOR hereby authorizes the CONTRACTOR (1) to deduct from any amount due or becoming due the SUBCONTRACTOR under this Agreement for all amounts of owing from the SUBCONTRACTOR to (a) the CONTRACTOR for backcharges or services furnished for the account of the SUBCONTRACTOR, (b) the CONTRACTOR for damages sustained whether through negligence of the SUBCONTRACTOR or through failure of the SUBCONTRACTOR to act as may be otherwise detailed herein, (c) other materialmen, (d) other subcontractors, (e) laborers, and (f) others for services and materials furnished to the SUBCONTRACTOR for the work performed under this

Agreement and (2) to apply the amount so deducted to the payment of said materials, services, damages, or backcharges applying such monies so available in the order hereinbefore set forth.

**Article Eight:** If the OWNER by the terms of the General Contract makes changes to the work to be done by the SUBCONTRACTOR under this Contract, then the SUBCONTRACTOR agrees to perform the work necessitate[d] by such changes whether the changes alter, add to or deduct from the work to be performed under this Contract. The value of any such changes will be determined as follows: (1) by the unit price named in this Agreement, if possible: or (2) by agreement in writing between the CONTRACTOR and the SUBCONTRACTOR as to the value of the work. In any event, the SUBCONTRACTOR will keep and present, in any form as the CONTRACTOR may direct, a correct account of the net costs of any extra labor and materials, together with vouchers referring to the same.

If the SUBCONTRACTOR claims or intends to claim (1) that any work to be done by the SUBCONTRACTOR involves extra cost under this Agreement or (2) that the SUBCONTRACTOR is entitled to payment for any extra work to be performed before proceeding to executive work. The SUBCONTRACTOR will be allowed payment for claims for extra work or materials only if and when said claims are allowed and paid by the OWNER.

**Article Twelve:** The SUBCONTRACTOR will prosecute the work at all times in such manner as the CONTRACTOR may regard as best calculated to coordinate with the work of the CONTRACTOR and subcontractors of the CONTRACTOR and other contractors engaged upon the work. The Subcontractor must not commit or permit any act or omission which might interfere with the performance of work by any other entity. The SUBCONTRACTOR will immediately remove any employees of the SUBCONTRACTOR objectionable to the CONTRACTOR or the OWNER.

The SUBCONTRACTOR will confine the SUBCONTRACTOR'S apparatus, storage of materials and the operations of the SUBCONTRACTOR'S workmen to limits indicated by law, ordinances or permits or rules and regulations of any governmental authority exercising jurisdiction in the premises. The SUBCONTRACTOR will not unreasonably encumber the premises upon which the SUBCONTRACTOR'S work is to be performed with materials and will not load or unload, and will not permit any part of any structure to be used, in such a manner as to endanger its safety of any person or persons or any property. The SUBCONTRACTOR will at all times keep the premises upon and about which the SUBCONTRACTOR is performing work free from accumulations of waste material or rubbish caused by the SUBCONTRACTOR'S EMPLOYEES OR THE subcontractor's work. Upon completion of the Subcontract Work, the SUBCONTRACTOR must remove from the site all equipment and unused materials and leave the site in a condition satisfactory to CONTRACTOR.

SUBCONTRACTOR shall have present on the job at all times, a competent foreman and superintendent, satisfactory to the CONTRACTOR, with full authority to take all requisite actions and maintain such equipment as is required to perform the work hereunder, and procure sufficient labor and materials to diligently perform the work hereunder.

**Article Sixteen:** This Agreement contains all of the terms of the agreement between the parties respecting the work, and all prior negotiations, conversations and writings between the parties with respect to the Contract are rescinded. No contemporaneous or subsequent conversation or writing will have any force or effect to modify this Agreement unless reduced to a writing signed by an authorized representative of each party.

**Article Seventeen:** SUBCONTRACTOR hereby warrants all work and materials performed, furnished or supplied in the course of its performance under this Contract are free from defects in material and workmanship during the same period for which the CONTRACTOR may be liable under the General Contract.

SUBCONTRACTOR further warrants that all materials furnished or supplied hereunder are fit for the ordinary and particular purpose for which they are being employed. SUBCONTRACTOR further covenants and warrants that all work and materials performed, furnished and supplied in the course of its performance under this Contract are in accordance with the current edition of the STANDARD SPECIFICATIONS. No payment on account to SUBCONTRACTOR will be construed or considered as an approval of the work for which payment is made.

(Pl. Ex. No. 30 at 3–8.)

25.     P&J's business practice is to evaluate the risk on a project in order to mitigate risk of loss through investigating the project and identifying areas that required added resources. (Pl. Ex. No. 30 at 15; Trial Tr. at 24–25, 28: Dec. 19.) P&J used this process in negotiating the Subcontract, *i.e.*, including a list of "clarifications and assumptions." (Pl. Ex. No. 30 at 15; Trial Tr. at 32: Dec. 19.)

26.     The relevant portions of "Attachment A" to the Subcontract, entitled "Clarifications [and] Assumptions," are provided as follows:

**Paragraph 1:** Our price utilizes existing right-of-way with off-road trucks to get material in place including crossing the railroad tracks at an existing road crossing to complete the fill needed from the railroad to Hwy. 6.

12

**Paragraph 2:** Prime contractor responsible for securing and purchasing all required fill.

. . .

**Paragraph 4:** Fine grading is to 0.1 of sub grade, [one] time only. Any re-grading due to weather will be on a time and material price mutually agreed to both parties.

**Paragraph 5:** Prime contractor to provide all surveying, location of structures, etc.

. . .

**Paragraph 11:** No cost has been included for any work exposed by proof rolling. If proof rolling exposes any remedial work, it will be extra.[5]

. . .

**Paragraph 15:** This proposal is based on monthly payments being made to Phillips & Jordan for work performed that month. Monthly payments will be due within the ten (10) days of the date of invoice. Final payment will be due within thirty (30) days of Substantial Completion.

(Pl. Ex. No. 30 at 15.)

    27.    P&J's proposal was incorporated in its entirety, without modification or exception, into the Subcontract as Attachment A. (*Id.*)

    28.    The Subcontract contains "Line Item Nos. 6–8" that include MCI's estimated quantities and the unit-prices to be paid to P&J:

---

[5] Proof Rolling is a method of "testing the roadway embankment and subgrade for stability and uniformity of compaction" that uses "a fully loaded tandem axle dump truck" operated "at a speed between [two hundred] 200 and [three hundred] 300 feet per minute [making a minimum of [five] 5 passes over each area proof rolled." An SCDOT inspector makes a subjective assessment of whether "areas shown by proof rolling operation [are] unstable or non-uniform. After correction of these deficient areas, repeat the proof rolling operation." (Def. Ex. No. 6 (SCDOT 2007 Standard Specifications for Highway Construction, Section 211.1–211.5).)

| Item | Description | [Quantity] | [Unit Measurement][6] | Unit Price | Total Price |
|------|-------------|------------|-----------------------|------------|-------------|
| 6 | Unclassified Excavation[7] | 76,000 | [Cubic Yards] | $4.43 | $336,680.00 |
| 7 | Unclassified Excavation (Ponds) | 110,125 | [Cubic Yards] | $4.27 | $470,233.75 |
| 8 | Borrow Excavation[8] | 478,000 | [Cubic Yards] | $5.64 | $2,695,920.00 |

(*Id.* at 2.)

29.    On October 8, 2014, P&J submitted a Request for Information ("RFI") to MCI in

an email between David Boyer, Senior Project Manager, and Joe Ledford, Project Superintendent,

regarding "quantities for payment of excavation," which states:

> **Request:** David, [P&J] has made a verbal agreement with you and your team to excavate borrow material from said locations. During excavation [P&J] will be paid based on total Cubic Yardage excavated from said locations whether the soil excavated be suitable or non-suitable.

> **Response:** Not sure which said locations you are referring to[,] but we do have a written agreement between [P&J] and [MCI] for P&J to excavate borrow material from plan identified retention ponds. It is agreed upon that MCI will pay P&J based on cubic yards for Unclassified Excavation, Unclassified Excavation (Ponds)[,] and Borrow Excavation. MCI will make arrangements for our surveyor to survey the ponds monthly and determine total amounts (cubic yards) removed. Due to the fact that the potential for some of these ponds to be dug deep, access and availability

---

[6] "Unclassified Excavation . . . is the volume of material excavated as prescribed and is measured by the cubic yard[.] The quantity includes the material acceptably excavated and is measured in its original position and determined from cross-sections by the method of average-end-areas, complete, and accepted. (Def. Ex. No. 6 (SCDOT 2007 Standard Specifications for Highway Construction, Section 203.5 ¶ 1).)

[7] "'Unclassified Excavation' consists of roadway and drainage excavation performed under this section regardless of the materials encountered or the manner in which they are removed and includes the work described in Subsection 203.2.1.3 through 203.2.1.8 unless otherwise provided." (Def. Ex. No. 6 (SCDOT 2007 Standard Specifications for Highway Construction, Section 203.2.1.2 ¶ 1).)

[8] "'Borrow' consists of material required for constructing of embankments or for . . . where the elevation of the existing subgrade is less than the subgrade elevation required[.] When sufficient borrow material is available entirely within the right-of-way, the work is covered by the item Unclassified Excavation[.]" (Def. Ex. No. 6 (SCDOT 2007 Standard Specifications for Highway Construction, Section 203.2.1.8 ¶¶ 1–2).) "When it is necessary to bring borrow material from outside of the right-of-way, the work is covered by the item Borrow Excavation, and the material requirements of this subsection apply to all borrow material used in the work regardless of its origin." (*Id.*) Moreover, Borrow "includes hauling, clearing and grubbing pits, securing necessary permits, haul roads, and all other incidental related costs." (*Id.*)

will be required for the surveyor to perform this function safely and timely. Once this has been completed it will be our (MCI & P&J [Project Manager's]) responsibility to come to an agreement based on the survey data.

(Pl. Ex. No. 32 at 1.)

30.    In connection with its Prime Contract, MCI was responsible for acquiring right-of-way land for the highway. (Def. Ex. No. 62 at 9–11.)

31.    MCI planned to use the land on-site and within the right-of-way to excavate fill material for the embankment construction. (Pl. Ex. Nos. 32 at 1, 51 at 1; 388-E at 1–5.)

32.    According to the Subcontract, P&J was to excavate[9] fill within the right-of-way[10] and use off-road trucks to haul it. (Pl. Ex. No. 30 at 15.)

33.    P&J dumped and compacted the fill in an area specified by MCI's embankment design.[11] (*Id.*)

### H.  The Santee Project

34.    In October 2013, MCI Executive Vice President Ron Sines requested that SCDOT

---

[9] The SCDOT standard specifications regarding excavation are as follows: "specifications for the materials, equipment, construction, measurement, and payment for the removal, placement, compaction, and satisfactory disposal of all materials encountered within the limits of the right-of-way and borrow pits necessary for the construction of the roadway." (Def. Ex. No. 6 (SCDOT 2007 Standard Specifications for Highway Construction, Section 203.1.1 ¶ 1).) "The limits of this work may include intersecting roads, driveways, ditches, channels, parking areas, ramps, and private entrances[,]" and "also consists of the removal and replacement of unsuitable material in the subgrade or under structures, the stripping of the roadway and material pits, and the excavation work necessary for the formation, compaction, and shaping of embankments, subgrade, shoulders, slopes, and intersections." (*Id.*)

[10] The right-of-way refers to "the land secured and reserved for the construction, improvement, and maintenance of the highway." (Def. Ex. No. 6 (SCDOT 2007 Standard Specifications for Highway Construction, Section 101.3.53).)

[11] "Embankment Compaction" required P&J to: "Compact each layer of embankment to not less than [ninety-five] 95.0% of maximum density before successive layers are applied . . . Accomplish the compaction by using suitable construction procedures while the material is at suitable moisture content." (Def. Ex. No. 6 (SCDOT 2007 Standard Specifications for Highway Construction, Section 205.4.6).)

use its power of eminent domain pursuant to the South Carolina Eminent Domain Act, S.C. Code Ann. § 28-2-10, *et seq.* (West 2020), to acquire the right-of-way adjacent to the Santee Project. (Pl. Ex. No. 389-B.) However, SCDOT Engineer and Design-Build Manager Claude Ipock wrote: "The use of SCDOT's power of eminent domain for the acquisition of borrow pits is not an option." (Pl. Ex. No. 389-B; Trial Tr. at 113: Dec. 2.)

35.    On October 25, 2013, SCDOT issued MCI a "Notice to Proceed" that, effective November 7, 2013, "[MCI] has [four hundred forty] 440 calendar days to complete the full scope of work, which corresponds to a project completion date of January 21, 2015." (Pl. Ex. No. 20; Def. Ex. No. 62 at ¶ A(1).) Claude Ipock of SCDOT emailed MCI Executive Vice President Ron Sines to notify him that the Santee Project's Substantial Completion date was January 20, 2015, and the final completion date was July 20, 2015. (Pl. Ex. No. 20.)

36.    In March 2013, January 2014, and March 2014, SCDOT sent MCI Issue Paper Nos. 1, 2, and 5, which impacted MCI's design and schedule by adding: (1) "Design/Construct additional paved shoulders, SC-6 Connection"; (2) Design/Construct the Access Road 575 ft. East of RFP Location"; and (3) "Cost to incorporate FEMA Map into the project." (Pl. Ex. Nos. 3 at 4, 389-F at 1; Def. Ex. Nos. 95, 96, 97.)

37.    On March 27, 2014, the Federal Emergency Management Agency ("FEMA") published updated flood plans for the Orangeburg region that had to be incorporated into MCI's design. (Pl. Ex. No. 388-A.)

38.    On July 14, 2014, SCDOT approved MCI's construction design and plans. (Def. Ex. No. 2 at 8.)

39.    On September 18, 2014, P&J contract administrator Valerie Holder emailed P&J Project Superintendent Joe Ledford, P&J President Patrick McMullen, P&J Project Executive

16

Dudley Orr, and P&J Vice President Edd Satterfield: "I spoke with Sonya with [MCI]. Our work has to be completed within a ten-month period, as all work must be completed in this timeframe. They will be sending out a completed schedule of work within a week or two." (Pl. Ex. No. 194 at 3.) Edd Satterfield responded: "We are still discussing the completion time with them. Nothing is set in stone at this time." (*Id.*) Moreover, Patrick McMullen stated: "It just makes sense that if they can flow down liquidated damages to [P&J] that we agree on schedule milestones associated with our work to include with the subcontract." (*Id.*)

40.    Under the Subcontract terms, MCI was required to provide P&J with a production schedule for the Santee Project. (Pl. Ex. No. 30.) MCI did not have the required production schedule for P&J at the time P&J and MCI executed the Subcontract.

41.    On October 1, 2014, MCI generated a Critical Path Method ("CPM") schedule entitled "CPM Baseline Narrative Update #11" to submit for SCDOT's approval in accordance with the Prime Contract. (Pl. Ex. No. 308 at 1–15; Def. Ex. No. 62 at 16–17.)

42.    On October 10, 2014, MCI created a CPM schedule entitled "38.036984 Rebaseline" that showed total float of negative one hundred forty-nine (149) days (hereafter "Draft CPM Schedule").[12] (Pl. Ex. No. 59.)

43.    On October 13, 2014, Edd Satterfield, P&J's Vice President, emailed Valerie Holder, P&J's contract administrator, to explain:

> The schedule has not been approved by SCDOT[,] so we don't have an approved schedule to base our milestones off of. We may have to see if we can sign the subcontract and state base off of a forthcoming schedule to be agreed upon by both parties. [MCI] has done their part, we are the ones holding up the subcontract.

---

[12] Float is "[t]he amount of time between when an activity 'can start' (the early start) and when an activity 'must start' (the late start)." United States Department of Transportation Federal Highway Administration, *Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects*, FP-14, § 108.03(a)(2), (June 4, 2020), https://highways.dot.gov/federal-lands/specs.

(Pl. Ex. No. 194 at 1.)

44.    On October 14, 2014, MCI Vice President Ron Sines sent Joseph Ledford, P&J's Superintendent on the Santee Project, an email with the subject line "FW: rebase line no money" and an attached portable document format ("PDF") entitled "Baseline 3 without money.pdf." (Pl. Ex. No. 59; Def. Ex. No. 219.) The body of the email provides: "Attached is the latest and greatest schedule per your request. As usual, it is subject to change and I'm sure it will change as we work our way through the project[.]" (Pl. Ex. No. 59.)

45.    The Draft CPM Schedule was created on October 10, 2014, and showed a construction start date of October 13, 2014, and a completion date of June 7, 2015, with one hundred forty-nine (149) days of negative float. (*Id.* at 2–7.) In comparison, CPM Baseline Narrative Update #11 showed "earthwork" activities on the Santee Project with seventy-one (71) days of negative float. (*Id*. at 11.) Moreover, "CPM Baseline Narrative Update #12" created on November 10, 2014, showed seventy-three (73) days of negative float. (*Id*. at 25.)

46.    On November 17, 2014, P&J Superintendent Joe Ledford emailed the Draft CPM Schedule to P&J employees Thomas Wilson and Weston Haney. (Def. Ex. No. 465.)

47.    On January 7, 2015, SCDOT resolved Issue Papers Nos. 1, 2, and 5 in a change order ("SCDOT Change Order No. 2"), which provided MCI with additional money and changed the Substantial Completion date to October 18, 2015. (Pl. Ex. Nos. 62 at 1–2, 389-F; Trial Tr. at 122: Dec. 3.)

48.    More specifically, the change order provided MCI with an additional one million, five hundred fifteen thousand, twelve dollars, and fifty cents ($1,515,012.50) for costs and added two hundred seventy-one (271) days to the schedule, thereby altering the completion date from January 20, 2015, to October 18, 2015. (Pl. Ex. No. 62.) Moreover, the change order allowed

MCI to acquire Ponds 2, 6, and 7. (Pl. Ex. No. 72.)

49.    From March 2015 to January 2017, approximately ninety (90) proof roll tests received a failing grade. (Pl. Ex. No. 279.)

50.    On May 16, 2015, MCI Executive Vice President Ron Sines emailed P&J Superintendent Joe Ledford, P&J Project Executive Dudley Orr, MCI Project Manager David Boyer, and P&J Vice President Edd Satterfield to explain inefficiency impacts caused by the on-site material:

> We have been paying for hauling dirt back and forth across the old fly bridge as off-road trucks are not allowed to use [the bridge] loaded [with material]. We hauled a lot of sand out of pond one to the railroad bridge fills to keep that part of the project moving forward since no other borrow source was dry enough to use at the time. We are now hauling unclassified from the east side of [Interstate]-95 to the deep fills on the west side in order to make some type of progress while working through the borrow dirt problems. At the same time, off-road trucks are hauling from the same unclassified location to the east side of the railroad bridge fill already in place and the stream bridge. Unfortunately, the unclassified material will be used up shortly.

> We are trying to work with you to keep the project on track and understand you are having difficulties getting moisture contents down for passing compaction tests. However, I do want to point out that this isn't all our problem. There is suitably classified dirt available to use with the off-road trucks, but it is taking way too long to get it dry enough. I have sent an inquiry if cement, fly ash, or lime could be used as a drying agent but haven't gotten a response yet. That would be costly, but so are extra [liquidated damages]. Whatever we do, we have to be aware of what the extra costs are going to be for all of us. We have footed the bill for the on-road trucks and haven't asked for an adjustment in any of your prices at this point. You have also contributed resources trying to work with the available materials which I know isn't what you probably expected either.

> . . .

> Something to keep in mind with any off-site source is the time it will take for permitting. Unless the site is already a commercial source, nothing is going to happen overnight. We are already way behind schedule due to the extremely wet weather we had from Thanksgiving to mid-April. The days are getting hotter and have been much drier recently which is a trend I hope continues.

> I also fear that off-site borrow sites might have the same issues as our on-site

borrow pits. We did drill some sites close to the project a long time ago and got the same basic results as we had for the ponds we are using.

In summary, I urge everyone to put on their thinking caps to see how we can conquer the dirt problems while keeping cost in mind. None of us have a choice whether we finish this job or not. So[,] let's figure out the best way to do that. We can call this the 'project from Hell' and if any of you thinks praying will help, I encourage you to put in some overtime on that!!!!!

(Pl. Ex. No. 46 at 1–2.)

51.     In May 2015, MCI began its search for off-site dirt sources because the on-site material proved to be problematic: "The current issue with the dirt is not what we expected. We have layers of dirt in multiple detention ponds that meet the classification requirements. Unfortunately, it has taken a lot more time for the dirt to dry to an acceptable moisture content in order to pass the compaction tests." (Pl. Ex. No. 46 at 1.)

52.     On July 22, 2015, MCI Executive Vice President Ron Sines sent an email to P&J Project Superintendent Joe Ledford regarding the risk and responsibility of dirt work, proof rolling issues, and dirt issues:

In summary, the dirt work has always been your responsibility and you have failed to perform your work in accordance with the original project schedule resulting in Liquidated Damages. We tried to offer suggestions to help you accomplish your work, but we will refrain from offering advice or opinions from here on as you are the dirt experts.

Thank you for your call this morning starting so clearly that the dirt is totally your responsibility and we should stay out of it. Clarifying this position is long overdue and I apologize for not drawing the clear lines long ago. I was more concerned with partnering than being the prime contractor, but I can change even at my age.

(Pl. Ex. No. 142; Def. Ex. No. 220.)

53.     On September 15, 2015, MCI submitted a request to use A-7 classified material, which SCDOT rejected, and notified SCDOT that it would not make the October 2015 Substantial Completion Date as amended by SCDOT Change Order No. 2. (Pl. Ex. No. 389-I; Trial Tr. at 65–

66: Dec. 3 (explaining that A-7 is a high clay content material that retains water).)

54.     SCDOT informed MCI that its position regarding the soil classification remained

unchanged. (Pl. Ex. No. 389-J.)

55.     On September 17, 2015, MCI sent SCDOT a request for an equitable adjustment of

contract time ("RFA") that provides:

> Despite our efforts to complete the project on time, we just aren't going to make the
> October 18th Substantial Completion Date. I think this is obvious and supported by the
> schedule updates for several months now.
>
> . . .
>
> To say that the dirt work issue is a recent development would not be accurate. We have
> unfortunately been at odds over the Special Provision for Borrow Excavation contained in
> the RFP since construction started. We have had several meetings with [SCDOT] and
> numerous email exchanges and conversations regarding this issue. Our position on the
> Special Provision was not accepted, so we tried to work with [SCDOT's] position which
> resulted in great monetary cost to us and our subcontractors with negative impact on the
> project schedule.

(Pl. Ex. No. 49 at 1–2.)

56.     On September 17, 2015, MCI emailed P&J an attachment that contained talking

points about how SCDOT changing the soil classification had impacted the Santee Project. (Def.

Ex. Nos. 259, 262.)

57.     On September 24, 2015, P&J and MCI representatives held a meeting near Atlanta,

Georgia, where P&J Project Executive Dudley Orr presented a Power Point showing on-site

material was virtually exhausted. (Pl. Ex. No. 211; Def. Ex. No. 357; Trial Tr. at 58–59: Jan. 19.)

58.     Pay applications reflect that P&J remained on the Santee Project. (Pl. Ex. Nos. 236,

239, 384, 384-A; Def. Ex. No. 306.)

59.     A "thousand-year flood" occurred in October 2015. (Pl. Ex. No. 388-H at 1; Trial

Tr. "A" at 17: Jan. 30.) Approximately twenty (20) inches of rain fell on-site, which coincided

with the import fill being hauled by Manning to the Santee Project. (Pl. Ex. No. 388-H at 1–9; Def. Ex. No. 270; Trial Tr. "B" at 31: Jan. 30.)

60.    On October 26, 2015, MCI entered a change order ("MCI Change Order No. 2") with Manning & Sons Trucking & Utilities, LLC ("Manning") to begin importing three thousand (3000) cubic yards of fill material daily. (Def. Ex. No. 50.)

61.    Manning hauled off-site material from October to December. (Def. Ex. No. 270; Trial Tr. "A" at 101: Jan. 29; Trial Tr. "B" at 22: Jan. 30.)

62.    In total, Manning imported one hundred sixty-four thousand, eight hundred ten (164,810) cubic yards of material to the Santee Project. (Ct. Ex. No. 2.)

63.    On October 15, 2015, MCI filed a Notice of Claim against SCDOT for schedule impact and asserted that MCI was incurring additional expenses as a result of moving fill material more than once. (Pl. Ex. Nos. 50, 388-D.)

64.    MCI and P&J agreed that on-site excavation of fill would cease in October 2015. (Trial Tr. "A" at 9–56: Jan. 30.)

65.    On October 28, 2015, MCI Project Manager David Boyer emailed Dudley Orr, Edd Satterfield, and MCI Southeast Division Manager Alan Sweat explaining that MCI did not track the amount of import dirt as to whether it was "direct delivery" or stockpiled. (Def. Ex. No. 270.)

66.    In November 2015, MCI's Board of Directors issued an "Operations and Staffing Report" that described the Santee Project as "cursed" and states that:

> This is one of the last projects that was bid prior to instituting new estimating procedures. Our problem centers around dirt placement. The quality and quantity of the dirt was not properly [assessed] at bid time. The frustrating fact is that when we realized in 2013 when we had made a bidding error we hired the best dirt contractor in the state to mitigate the damage. Unfortunately, due to the constant rains and the nature of the dirt (which is very slow to dry), our dirt sub has not been able to make any progress. We have filed two claims on the project: one for misrepresentation of specification of the borrow specification that caused us huge

delays regarding completion of the project and the other for time delays due to the hurricane that hit in October.

(Pl. Ex. No. 54, 214 at 7–8.)

67.    From November 10, 2015, to November 12, 2015, P&J and MCI exchanged emails regarding the alleged agreement to split cost of import fill. (Pl. Ex. No. 213.) However, Ron Sines concluded the email exchange stating: "Apparently I was wrong about Teddy and Joe reaching an agreement. I apparently misheard what I thought Joe said. So, forget I said anything as I've already been informed [that] I was wrong and should stay out of it." (*Id.*)

68.    On November 19, 2015, MCI Project Manager David Boyer emailed a monthly cost submission to SCDOT Project Manager Laura Fulton that included a written report: "The effect to the schedule caused by [SCDOT's] imposition of soil testing and use restrictions beyond those specified in [the Prime Contract] will extend the duration of our work well beyond our currently established October 18, 2015, Substantial Completion date." (Pl. Ex. No. 388-F at 2.) Moreover, "[t]he delay due to [SCDOT's] imposition of soil material testing and soil material requirements beyond those that were actually a part of [the Prime Contract], primarily impacted the dirk work." (*Id.*)

69.    On April 22, 2016, MCI emailed SCDOT a request for additional time to the Prime Contract Substantial Completion and Final Completion dates, citing "the 1,000-year flood event that inundated the [Santee Project] in October of 2015, subsequent adverse weather and flooding, which are still affecting production today." (Pl. Ex. No. 388-H at 1.)

70.    In April 2016, MCI sent a letter to P&J to establish that the companies had agreed to split the cost of the off-site material, which P&J did not sign. (Def. Ex. No. 59; Pl. Ex. No. 213 ("Apparently I was wrong about Teddy and Joe reaching an agreement. I apparently misheard what I thought Joe said.").)

71.     On May 1, 2016, MCI processed the last payment application of P&J. (Pl. Ex. No. 236 at 189–93.) MCI had continually approved P&J's pay applications from October 2014 to May 2016. (Pl. Ex. No. 236 at 1–193.)

72.     As of May 1, 2016, P&J excavated and placed six hundred forty-four thousand, one hundred twenty-five (644,125) cubic yards of material on the Santee Project. (Pl. Ex. Nos. 30, 135 at 13, 277, 384.)

73.     After May 13, 2016, P&J excavated and placed an additional one hundred ninety thousand, eight hundred sixty-six (190,866) cubic yards of material on the Santee Project. (Pl. Ex. Nos. 135, 277, 384.)

74.     On September 26, 2016, MCI expressed concern about the amount of equipment and personnel that P&J committed to various areas of construction on the Santee Project:

> MCI does not agree with the manner that [you're] completing your assignments . . . working in multiple areas at the same time would speed up the completion of [P&J's] scope [of work], and be most advantageous for the project as a whole.
>
> . . .
>
> This email is not intended to be a back and forth, but [an] understanding of different perspectives to figure out the best and fastest way to get this job completed. P&J has been working hard, and I can personally commend your efforts . . . We are in this together, and I am sure you would agree that both parties succeed when we complete this project. As the Prime [C]ontractor it is our obligation to ask the tough questions, and communicate with the subcontractor to build this job.

(Def. Ex. No. 330.)

75.     On October 14, 2016, MCI Southern Division Manager Alan Sweat emailed P&J President Patrick McMullen about the project schedule, P&J's equipment and personnel, liquidated damages, and the status of payment for the Santee Project:

> Due to the continued lack of progress by [P&J], [MCI] is exercising [MCI's] right under our Subcontract to deduct amounts to reimburse [MCI] for the costs it has and continues to incur due to P&J's failure to timely and fully perform its work in

accordance with its obligations under the Subcontract.

(Pl. Ex. No. 220 at 1–2.)

76.     On October 15, 2016, Dudley Orr emailed Sean Lind, Alan Sweat, and David Boyer a daily progress report that provides, in part, "Sean Lind used bulldozer to create access to concrete trucks and thus messed up slope [] this item will be worked for the [second] time in the coming week[.]" (Def. Ex. No. 336 at 1; Trial Tr. "A" at 38–39: Jan. 30.)

77.     On October 17, 2016, P&J submitted a notice of its demand for payment to Defendants. (Pl. Ex. No. 379.)

78.     On November 1, 2016, MCI held a meeting in their Atlanta, Georgia office that was attended by P&J President Patrick McMullen, P&J Owner Teddy Phillips, P&J Project Executive Dudley Orr from P&J and Greg Bush, Joe Bush, Alan Sweat, David Boyer, and Sean Lind from MCI, to discuss dirt costs and liquidated damages. (Pl. Ex. No. 396.)

79.     On November 9, 2016, Greg Bush sent Teddy Phillips a letter including "settlement options" for P&J's consideration. (Pl. Ex. No. 218.)

80.     On January 27, 2017, Teddy Phillips responds to Greg Bush rejecting all four of the "settlement options." (Pl. Ex. No. 371.)

81.     On February 17, 2017, the Santee Project reached Substantial Completion, which was four hundred eighty-nine (489) days after the date amended by SCDOT Change Order No. 2. (Pl. Ex. 135 at 8.) As a result, SCDOT assessed liquidated damages against MCI totaling three million, six hundred sixty-seven thousand, five hundred dollars, and zero cents ($3,667,500.00). (*Id.*) SCDOT also assessed liquidated damages against MCI in the amount of sixty-four thousand, five hundred dollars, and zero cents ($64,500.00) because Final Completion was late by forty-three (43) days. (*Id.*)

82.     On March 10, 2017, P&J demobilized from the Santee Project and subsequently refused to return to complete the punch list required by SCDOT. (Pl. Ex. No. 132, 391, 392; Def. Ex. Nos. 86, 154.)

83.     On March 20, 2017, P&J sent a certified letter entitled "Correspondence of October 25, 2016 & Renewed Notice of Claim" regarding Bond No. 929580183. (Pl. Ex. Nos. 378, 379, 380; ECF No. 1-2 at 1–4.)

84.     On April 2, 2017, MCI achieved the Final Completion of the Santee Project. (Pl. Ex. No. 392.)

85.     On May 11, 2017, MCI sent an email to SCDOT requesting additional time for the Prime Contract Substantial Completion and Final Completion dates "because of the adverse weather and flooding events that hit the [Santee Project] in September and October 2016, including Hurricane Matthew." (Pl. Ex. No. 388-J at 1.) Specifically, MCI stated:

> As in the fall of 2015, this project continued to be hampered by Acts of God and floods in 2016. During that time, the project was hit by no less than five named storms, from Tropical Storm Bonnie in May 2016, to Hurricane Matthew in October 2016. The months of September and October 2016 were particularly impacted with our on-site rain gauges indicating that the project received 15.91 inches and 12.90 inches of rain respectively.

(*Id.* at 2.)

86.     MCI filed a certified claim against SCDOT on February 2, 2018, seeking an extension of time adding five hundred forty-eight (548) days to the Prime Contract and costs in the amount of ten million, eight hundred ninety-one thousand, four hundred thirty-five dollars, and ninety-seven cents ($10,891,435.97). (Pl. Ex. Nos. 304, 308 at 17, 19.)

87.     On February 27, 2018, P&J filed a Complaint against MCI, claiming that MCI was in breach of the Subcontract. (ECF No. 1.)

88.     On August 1, 2018, SCDOT responded to MCI's certified claim: "[SCDOT]

believe[s] the additional cost and delays incurred on the [Santee Project] are primer[ily] a result of [MCI's] erroneous assumptions." (Pl. Ex. Nos. 306 at 1, 3 at 1–21.)

89.    On December 4, 2018, the Dispute Resolution Board held a hearing regarding MCI's certified claim against SCDOT. (Pl. Ex. No. 70 at 1.)

90.    On February 20, 2019, SCDOT and MCI agreed to accept the DRB decision. (Def. Ex. No. 4 at 1–4; Trial Tr. at 49: Dec. 3.)

91.    On July 24, 2019, TI Coastal, PLLC, produced a survey report to MCI "for three [3] ponds off of I-95 in Santee, South Carolina." (Def. Ex. No. 2-10 at 4–5.) The survey lists a "net volume excavated" as three hundred sixty-seven thousand, seven hundred eighty-seven (367,787) cubic yards. (*Id.* at 5.)

92.    MCI's Expert Witness, Bryon Willoughby, provided summaries of the earthwork quantities and schedule delays. (Def. Ex. No. 2 at 5–23; Trial Tr. "A" at 12–114, "B" at 1–93: Jan. 27; Trial Tr. "A" at 1–43: Jan. 28.)

93.    Willoughby measured the total quantities as follows: "Generally, the volume can be measured in three scenarios[:] (1) in situ – meaning in its original place before being excavated or disturbed; (2) loose – meaning excavated but not placed or compacted as in a stockpile or in the bed of a haul truck; (3) embankment – meaning after it has been spread and fully compacted as per the specifications." (Def. Ex. No. 2 at 5.)

94.    Willoughby also provided an evaluation of delays to MCI's project schedule, which concluded that P&J was responsible for one hundred eighty-nine (189) days of delays. (Def. Ex. No. 2 at 7; Trial Tr. "B" at 20–23: Jan. 30.)

95.    P&J's Expert Witness, John L. Tompkins, concluded that MCI's CPM schedules contained numerous logic errors and did not incorporate any meaningful deadlines for P&J to

measure progress on the Santee Project. (Pl. Ex. Nos. 135 at 14–20, 248, 308.)

96.     Tompkins also provided an analysis of P&J's total quantities based on the excavated quantities, not on the final quantities of embankment construction. (Pl. Ex. No. 135 at 12–13.)

97.     The Subcontract required MCI to provide a surveyor on-site. (Pl. Ex. Nos. 30 at 15 ¶ 5, 32 at 1.) MCI did not provide a surveyor on the Santee Project, which resulted in P&J producing its own survey data. (Pl. Ex. Nos. 387.)

98.     Tompkins found that, "[b]etween October 13, 2014, and May 1, 2016, MCI certified that 649,473 [cubic yards] of material had been excavated and did not dispute this quantity for two years." (Pl. Ex. Nos. 135 at 13, 384.) Moreover, Tompkins determined that "P&J handled 854,991 [cubic yards] of material[,] 190,866 [cubic yards] more than the Subcontract quantity made up of 152,772 additional cubic yards of Unclassified Excavation, 16,848 additional cubic yards of Unclassified Pond Excavation, and 21,246 cubic yards of Borrow excavation[.]" (Pl. Ex. No. 135 at 13.)

99.     Further, "[t]he additional material handled by P&J was either wasted on-site at MCI's direction at unclassified waste piles . . . or wasted and then later used in embankments at MCI's direction." (Id. (citing Pl. Ex. Nos. 5, 391).)

100.     Tompkins noted that, "[i]n general, excavation of material on-site below topsoil to design elevations was considered 'unclassified' and anything excavated below design elevations (over-excavation) was considered 'borrow.' Any material from off-site was considered borrow." (Pl. Ex. Nos. 72, 135 at 12 n.5.)

101.     As to the schedule, Tompkins' Expert Report attributes three hundred sixty-four (364) calendar days of "slippage" and provides: "In the [three hundred sixty-six] (366) [calendar

28

day] period from 6/1/15 to 6/1/16 MCI shows that [forty-seven] (47) [percent] of the earthwork was completed but no progress toward time of completion was achieved[,]" meaning that the MCI schedule forecasts show "[three hundred sixty-four] (364) [calendar days] slippage in three hundred sixty-six (366) day period. This is indicative of inadequate original duration for the work to be performed." (Pl. Ex. Nos. 135, 248.)

## IV. CONCLUSIONS OF LAW

### A.  The Court's Jurisdiction

1.    The court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) (2012). Diversity jurisdiction requires complete diversity of the parties and an amount in controversy in excess of $75,000.00, exclusive of interest and costs. See 28 U.S.C. § 1332(a). Complete diversity of the parties in a case means that no party on one side may be a citizen of the same state as any party on the other side. *See Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 372 (1978).

2.    There is diversity jurisdiction in this case because P&J and MCI seek damages in excess of $75,000.00, exclusive of interest and costs, and complete diversity exists between the parties. (*See* ECF Nos. 11 at 16, 18 at 18.)

3.    P&J seeks three million, three hundred forty-four thousand, one-hundred seventy-four dollars, and sixty cents ($3,344,174.60) in damages. (ECF No. 162-1 at 2; Court Ex. 1; Pl. Ex. No. 125.)

4.    MCI seeks damages in the amount of one million, three-hundred fifty-eight thousand, six-hundred fifty-six dollars, and twenty-four cents ($1,358,656.24). (ECF No. 161-1 at 5.)

5.    P&J is organized under the laws of North Carolina and has a principal place of

business in Tennessee. (ECF Nos. 11, 18; Pl. Ex. No. 207 at 1.)

6.      MCI is organized under the laws of, and has a principal place of business in, Iowa. (*Id.*)

7.      WSC is organized under the laws of, and has a principal place of business in South Dakota. (*Id.*)

**B. Actions Tried Without a Jury**

8.      "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1).

9.      Where the court serves as the trier of fact, it must determine the credibility of witnesses and the weight to be given their testimony. *See J.S.K. Realty Co. v. New Plan Realty Tr.*, 9 Fed. App'x. 89 (4th Cir. 2001). The court has both the right and the duty to weigh the evidence and to draw reasonable inferences and deductions.  *See United States v. Bales*, 813 F.2d 1289 (4th Cir. 1987) (where jury trial is waived, the judge weighs the evidence, determines the credibility of the witnesses, and finds the facts).

**C. Governing Law and Burden of Proof**

10.      This action falls under the diversity jurisdiction granted to federal courts pursuant to 28 U.S.C. § 1332, and therefore the laws of South Carolina determine the standards applicable to the interpretation of the contract at issue. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

11.      South Carolina choice-of-law rules dictate that the court must apply the law specified in the Subcontract. *See Bannister v. Shepherd*, 4 S.E.2d 7, 9 (S.C. 1939); *see also Livingston v. Atl. Coast Line R.R.*, 180 S.E. 343, 345 (S.C. 1935).

12.     The parties do not dispute that the Subcontract is governed by the laws of South Carolina. (Pl. Ex. No. 30 at 1.)

13.     A party alleging breach of contract bears the burden of proving, by a preponderance of the evidence, each element, including damages. *See Pascoe v. Wilson*, 788 S.E.2d 686, 693 (S.C. 2016). "A preponderance of the evidence is evidence which convinces the fact finder as to its truth." *Id*.

**D.  Contract Interpretation**

14.     "Building contracts and accompanying specifications, like other documents, are to be construed according to their terms." *Davies v. Kahn*, 251 F.2d 324, 325 (4th Cir. 1958); *see also Williams Trucking Co. v. JW Constr. Co.*, 442 S.E.2d 197 (S.C. Ct. App. 1994) *reh'g denied* (Apr. 21, 1994) (applying general rules of contract law to interpret a construction contract).

15.     Each party to a contract is charged with full knowledge of its complete contents, regardless of whether they actually read the contract. *See First Baptist Church of Timmonsville v. George A. Creed & Son, Inc.*, 281 S.E.2d 121, 122–23 (S.C. 1981) ("[I]n the absence of a showing of fraud, mistake, unfair dealing[,] or the like, a party to a contract . . . cannot escape [an] obligation . . . by simply declaring: 'But I did not read the whole agreement.'") (citation omitted).

16.     "The construction of a clear and unambiguous contract is a question of law for the court." *Hawkins v. Greenwood Dev. Corp.*, 493 S.E.2d 875, 878 (S.C. Ct. App. 1997) (citing *United Dominion Realty Tr., Inc. v. Wal–Mart Stores, Inc.*, 413 S.E.2d 866, 868 (S.C. Ct. App. 1992)).

17.     "A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who (1) has examined the context of the entire integrated agreement; and (2) is cognizant of the customs, practices, usages, and

31

terminology as generally understood in the particular trade or business." *Hawkins*, 493 S.E.2d at 878.

18.     Generally, ambiguities in construction contracts are construed against the drafter. *See Myrtle Beach Lumber Co. v. Willoughby*, 274 S.E.2d 423, 426 (S.C. 1981).

19.     If a building contract is ambiguous, then evidence, including oral testimony, regarding trade customs, practices, interpretation of such contracts, is admissible to explain the ambiguity. *See, e.g.*, *United States Use of Sligh v. Fullerton Constr. Co.*, 296 F. Supp. 518, 522 (D.S.C. 1968), *aff'd*, 407 F.2d 1339 (4th Cir. 1969) (citing *Eureka Elastic Paint Co. v. Bennett-Hedgpeth Co.*, 67 S.E. 738 (S.C. 1910); *Charles, et al. v. B & B Theatres*, 106 S.E.2d 455, 456 (S.C. 1959); *Bruce v. Blalock*, 127 S.E.2d 439, 441 (S.C. 1962).)

20.     Evidence of construction industry practices is also admissible in determining whether a contractor or subcontractor is in breach of a contract. *See Hunter Bros. Systems, Inc. v. Brantley Constr. Co.*, 332 S.E.2d 206, 210 (1985).

21.     However, "[w]here the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *McGill v. Moore*, 672 S.E.2d 571, 574 (S.C. 2009).

22.     "The court's duty is to enforce the contract made by the parties regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully." *Ellis v. Taylor*, 449 S.E.2d 487, 488 (S.C. 1994).

23.     However, "[b]y striking the offending language the Court [can]not rewrite the contract or substitute its own terms for those of the parties." *Weaver Cooke Constr., LLC v. Stock Bldg., Supply, LLC,* No. 5:14-cv-537-BR, 2016 U.S. Dist. LEXIS 109490, at *9 (E.D.N.C. Aug. 12, 2016) (citation omitted).

24.    "There is a presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992). "Unless justice so requires, courts should hesitate to rewrite a contractual arrangement after a material breach by one party, for the standard remedies of law and equity usually can accommodate the requisite adjustment of obligations." *Id.*

### E. P&J's Claim for Breach of Contract Against MCI

25.    In its Amended Complaint, P&J claimed that MCI breached the Subcontract by: (1) "failing and refusing to pay P&J in full for labor, materials, and equipment provided by P&J in performing its scope of work under the Subcontract and in performing extra work[.]"; (2) failing to "timely provide the required quality and quantity of fill, which resulted in P&J furnishing extra labor, materials, and equipment . . . as well as performing extra work and incurring delay damages," including remedial work, *i.e.*, proof roll rework; and (3) failing to "adjust the contract price and time for extra work ordered by MCI, and for excusable delays or compensable inefficiency impacts to P&J's work as a result of MCI's direction for P&J to work in a 'scattershot' progression instead of the west to east progression as contemplated by the Subcontract." (ECF Nos. 11 at 8, 12 ¶¶ 77–83, 84-10 at 35, 161 at 3–4.)

#### i. Legal Standard

26.    To recover for a breach of contract, a party must prove: (1) a binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damage suffered by the plaintiff as a direct and proximate result of the breach. *See Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962).

27.    "In order to prevail on [a] claim of breach of contract, [a] plaintiff bears the burden

of establishing the existence and terms of the contract, defendant's breach of one or more of the contractual terms, and damages resulting from the breach." *Taylor v. Cummins Atl., Inc.*, 852 F. Supp. 1279, 1286 (D.S.C. 1994), *aff'd*, 48 F.3d 1217 (4th Cir. 1995), *cert. denied*, 516 U.S. 864, 116 (1995).

28.     However, "to recover damages for the breach of a contract, a plaintiff must show that the contract has been performed on his part, or at least that he was at the appropriate time able, ready and willing so to perform it." *Parks v. Lyons*, 64 S.E.2d 123, 126 (S.C. 1951).

### ii. Existence of Contract

29.     In South Carolina, a contract is defined as "an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct." *Roberts v. Gaskins*, 486 S.E.2d 771, 773 (S.C. Ct. App. 1997).

30.     Here, the parties do not dispute that the Subcontract is a valid contract between P&J and MCI. (Pl. Ex. No. 30.)

### iii. Breach of Contractual Obligation

31.     "A breach of contract is defined as a violation of contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance." *Parco Merged Media Corp. v. Multispectral Sols., Inc.*, No. 2:06-cv-46, 2006 U.S. Dist. LEXIS 29453, at \*25 (E.D. Va. Apr. 21, 2006) (internal quotation marks omitted).

#### a.   First Breach – Failure to Pay for Labor, Materials, and Equipment

32.     Article Two states that "[p]ayment hereunder shall be limited to the actual quantities of work installed and accepted by [SCDOT]." (Pl. Ex. No. 30 at 1.)

33.     Article Seven provides: "The CONTRACTOR will make partial payments to the SUBCONTRACTOR   for   the   work   performed   and   materials   furnished   by   the

SUBCONTRACTOR . . . [t]he CONTRACTOR will make payments to the SUBCONTRACTOR within ten (10) working days[.]" (Pl. Ex. No. 30 at 3.)

34.    The Subcontract incorporated Attachment A, which expressly states that MCI is responsible for "monthly payments being made to [P&J] for work performed that month. Monthly payments will be due within the ten (10) days of the date of invoice. Final payment will be due within thirty (30) days of Substantial Completion." (*Id.* at 15 ¶ 15.)

35.    Generally, a prime contractor will include a "pay-when-paid" clause in a subcontract. *See, e.g.*, Universal *Concrete Prods. v. Turner Const. Co.*, 595 F.3d 527, 529 (4th Cir. 2010).

36.    "Pay-when-paid" clauses are valid under South Carolina law. S.C. Code Ann. § 29-6-230 (West 2020) (explaining that "performance by a construction subcontractor in accordance with the provisions of its contract entitles the subcontractor to payment from the party with whom it contracts" and that "payment by the owner to the contractor or the payment by the contractor to another subcontractor or supplier is not, in either case, a condition precedent for payment to the construction subcontractor.").

37.    By accepting "Attachment A" into the Subcontract, MCI must pay P&J regardless of when SCDOT pays MCI; if there is a delay in payment by SCDOT, then P&J must be paid "out of pocket" by MCI. *See id.*

38.    Article Eight of the Subcontract provides: "If the SUBCONTRACTOR claims or intends to claim (1) that any work to be done by the SUBCONTRACTOR involves extra cost under this Agreement or (2) that the SUBCONTRACTOR is entitled to payment for any extra work to be performed before proceeding to executive work." (Pl. Ex. No. 30 at 4.)

39.    The term "extra" as used in connection with a building contract means work that is

outside of and independent of the contract, not contemplated by the parties, and not controlled by the contract. *See Carolina Mech. Contractors, Inc. v. Yeargin Constr. Co.*, 198 S.E.2d 224, 229 (S.C. 1973).

40.     However, "there is no automatic or easy formula to determine whether a change is beyond the scope or not. Each case must be analyzed on its own facts and circumstances giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole." *Gen. Dynamics Corp. v. United States*, 585 F.2d 457, 462 (Ct. Cl. 1978).

41.     Moreover, extras must be requested or agreed to by the party to be charged for the extras. *D.A. Davis Constr. Co. v. Palmetto Props., Inc.*, 315 S.E.2d 370, 371–72 (S.C. 1984).

42.     Pursuant to the Subcontract, MCI Project Manager David Boyer had the authority to determine final quantities and therefore the final amount owed to P&J. (Pl. Ex. No. 30 at 1.) It is a primary responsibility of a project manager or an authorized representative to review and validate all monthly pay applications submitted by a subcontractor.

43.     From October 2014 to May 2016, MCI signed off on P&J's monthly pay applications without issue. (Pl. Ex. Nos. 236 at 1–193, 239, 384, 384-A; Def. Ex. Nos. 306, 306-A.)

44.     Beginning in May 2016, MCI failed to pay P&J for work completed at its direction. (Pl. Ex. Nos. 239, 384.)

45.     The greater weight of the evidence shows that MCI's reason for withholding payment from P&J, due to SCDOT withholding payment to MCI in the form of liquidated damages, was without merit. (Def. Ex. No. 80.)

46.     At trial, Mr. Boyer could not specify on what basis nor identify any reason for the

changes he made to the amounts owed to P&J. (Trial Tr. "A" at 77: Jan. 29.) For example, Mr. Boyer testified that he withheld payment for proof roll rework because he believed it was unfair for MCI to be responsible for those costs. (Trial Tr. "A" at 85–88: Jan. 27.)

47.    But, regardless of Mr. Boyer's opinion, the Subcontract clearly states that MCI must pay for proof roll rework costs. *See George A. Creed & Son*, 281 S.E.2d at 122–23 ("[I]n the absence of a showing of fraud, mistake, unfair dealing[,] or the like, a party to a contract . . . cannot escape [an] obligation . . . by simply declaring: 'But I did not read the whole agreement.'").

48.    Standard practice in the construction industry is for a final "accounting" at the end of a subcontractor's work to ensure that all outstanding financial issues are resolved. It is not a time to delve into the past and rework the figures for work that has already occurred and for which payment has been made. A loss on a budget item is a function of inadequate estimating at bid time and it is expected to be covered by the prime contractor. *See, e.g.*, *Hunter Bros.*, 332 S.E.2d at 210 (explaining that evidence of construction industry practices is admissible in determining whether a contractor or subcontractor is in breach of a contract.).

49.    It is a regular occurrence for some pay applications to be returned as unaccepted until the numbers reflect a proper billing amount. (Trial Tr. at 129, 141: Dec. 5.) All monthly subcontractor pay applications sent to the prime contractor should represent valid and approved dollar amounts. (*Id.*) When payment applications are "rubberstamped" and forwarded for payment, as MCI did in this case, then it is the responsibility of the prime contractor and its project manager to accept the consequences of such careless review. *See Ellis*, 449 S.E.2d at 488 ("The court's duty is to enforce the contract made by the parties regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully.").

50.    MCI's contention that the final quantities, as determined by MCI, are absolute and

exempt from P&J's challenge is altogether nonsense. (Pl. Ex. No. 30 at 1.) To illustrate MCI's position: As the prime contractor, MCI can direct P&J to perform work and subsequently refuse to pay P&J upon its completion, *e.g.*, P&J removing thirty-seven thousand, two hundred ninety-nine (37,299) linear feet of silt only to have MCI "cap" the amount at eight thousand, forty-eight (8,048) linear feet. (Pl. Ex. Nos. 239, 384.)

51.     Moreover, the final quantities are based on MCI's unreliable surveys. (Pl. Ex. No. 74; Trial Tr. at 12: Jan. 28.) P&J's quantities are reflected in pay applications and truck load counts that were routinely approved by MCI. (Pl. Ex. Nos. 239, 323, 331, 334, 384; Trial Tr. at 206–07: Dec. 16.)

52.     As MCI's Project Manager, Mr. Boyer's only recourse in this regard was to negotiate a change to the Subcontract. As an agent of MCI, Mr. Boyer is bound to the Subcontract as written, regardless of his personal feelings about its "fairness."

53.     Therefore, MCI's "failure to pay monthly estimates or draw requests as required by a contract constitutes a breach of the contract" and gives P&J "the right to consider the contract at an end, to cease work, and to recover the value of the work already performed." *See Zemp Constr. Co. v. Harmon Bros. Constr. Co., et al.*, 82 S.E.2d 531, 532 (S.C. 1954); *see also Roberts v. Sheriff Constr. Co.*, 328 S.E.2d 123, 124–25 (S.C. Ct. App. 1985).

54.     While the payment applications P&J submitted to MCI included a mechanic's lien waiver (Def. Ex. Nos. 135–48), MCI cannot enforce a mechanic's lien waiver against P&J because MCI was aware that the payment applications did not include outstanding claims. *See, e.g., Metro. Pier & Exhibition Auth. ex rel. Pitt-Des Moines, Inc. v. Mc3D, Inc.*, 56 F. Supp. 2d 984, 988 (N.D. Ill. 1999) (explaining that lien waivers do not apply in the absence of innocent good faith and that "[a] party will not be deemed innocent if . . . all of the parties knew the waiver

did not accurately reflect the current subcontract price and payment status.").

55.     Therefore, the court finds that MCI breached the Subcontract by failing to pay for labor, materials, and equipment furnished by P&J, at MCI's direction, during construction of the Santee Project after May 2016 in accordance with Articles Two, Seven, and Attachment A. (Pl. Ex. No. 30 at 15 ¶ 15.)

    b.   Second Breach – Failure to Provide Adequate Fill

56.     Article Four of the Subcontract provides: "The SUBCONTRACTOR will perform and observe all obligations of the CONTRACTOR under the General Contract relating to that portion of the work[.]" (Pl. Ex. No. 30 at 3.)

57.     Article Eight states: "If the OWNER by terms of the General Contract makes changes to the work to be done by the SUBCONTRACTOR under this Contract, then the SUBCONTRACTOR agrees to perform the work necessitate[d] by such changes under this Contract." (Pl. Ex. No. 30 at 4.) Moreover, "the SUBCONTRACTOR will keep and present, in any form as the CONTRACTOR may direct, a correct account of the net costs of any extra labor and materials, together with vouchers referring the same." (*Id.*)

58.     Article Seventeen states: "SUBCONTRACTOR hereby warrants all work and materials performed, furnished, or supplied hereunder are free from defects in material and workmanship . . . [and] are in accordance with the current edition of the [SCDOT] STANDARD SPECIFICATIONS." (Pl. Ex. No. 30 at 7.)

59.     The greater weight of the evidence shows that MCI failed to provide adequate fill pursuant to the Subcontract, *i.e.*, MCI's initial estimates of on-site material were inaccurate. (Pl. Ex. No. 214 at 7 ("The quality and quantity of dirt was not properly [assessed] at bid time.").)

60.     MCI claimed that "[w]e are trying to work with [P&J] to keep the project on track

and understand you are having difficulties getting moisture contents down for passing compaction tests. However, *I do want to point out that this isn't all our problem*." (Pl. Ex. No. 46 (emphasis added).)

61.     It is important to reiterate the fact that, under Attachment A, MCI owned the dirt. (Pl. Ex. No. 30 at 15 ("[MCI] is responsible for securing and purchasing all required fill"). Thus, any issues or costs related to the dirt was MCI's responsibility.

62.     Attachment A to the Subcontract states: "No cost has been included for any work exposed by proof rolling. If proof rolling exposes any remedial work, it will be extra." (Pl. Ex. No. 30 at 15 ¶ 11.)

63.     There is no ambiguity with respect to MCI's contractual obligation. *See, e.g.*, *Hawkins*, 493 S.E.2d at 878 (explaining that a contract is ambiguous when the terms of the contract are inconsistent on their face, or are reasonably susceptible of more than one interpretation.)

64.     MCI's failure to provide fill dirt interfered with P&J's ability to execute the Subcontract and therefore constitutes a breach of the Subcontract. A general contractor owes a subcontractor the same duties that an owner owes to a general contractor, including an obligation to refrain from delay or interference with the subcontractor's performance, to provide the subcontractor access to the job site, and to coordinate the subcontractor's work with other subcontractors. *See, e.g.*, *S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F. Supp. 1014, 1024 (S.D.N.Y. 1984), *aff'd without opinion*, 762 F.2d 990 (2nd Cir. 1984); *United States use of Heller Elec. Co. v. William F. Klingensmith, Inc.*, 670 F.2d 1227, 1232 (D.C. Cir. 1982); *Mullinax Eng'g Co. v. Platte Valley Constr. Co.*, 412 F.2d 553, 556 (10th Cir. 1969).

65.     As a result, the court finds that MCI failed to provide the fill dirt required by the

Subcontract.

### c.   Third Breach – Inefficient "Scattershot" Progression of Work

66.     Article Six stated that P&J "shall not exceed [its] proportionate share of the total delay in the completion of the Project, where such total delay in the Project's completion exceeds the time of delay actually attributable to the SUBCONTRACTOR." (Pl. Ex. No. 30 at 3.)

67.     Article Twelve required P&J to "prosecute the work at all times in such manner as the CONTRACTOR may regard as best calculated to coordinate with the work of the CONTRACTOR . . . [and] [t]he Subcontractor must not commit or permit any act or omission which might interfere with the performance of work by any other entity." (Pl. Ex. No. 30 at 6.)

68.     The greater weight of the evidence shows that P&J executed its contractual obligations despite MCI's directions for P&J to work in different areas of the Santee Project simultaneously, abandoning its plan for the sequence of work to move from west to east. (Pl. Ex. No. 306 at 5; Trial Tr. at 27: Dec. 17.)

69.     "There exists in every contract an implied covenant of good faith and fair dealing [and] . . . an obligation to perform it in a workmanlike manner[.]" *Tharpe v. G. E. Moore Co.*, 174 S.E.2d 397, 399 (S.C. 1970) (citing *Commercial Credit Corp. v. Nelson Motors, Inc.*, 147 S.E.2d 481 (S.C. 1966)) (citations omitted).

70.     A general contractor owes a subcontractor the same duties that an owner owes to a general contractor, including an obligation to refrain from delay or interference with the subcontractor's performance, to provide the subcontractor access to the job site, and to coordinate the subcontractor's work with other subcontractors. *See, e.g.*, *Harmonay*, 597 F. Supp. at 1024; *Klingensmith, Inc.*, 670 F.2d at 1232; *Mullinax*, 412 F.2d at 556.

71.     A contractor derives a benefit from having a schedule for performance defined in

41

the contract because it can properly plan an allocation of resources to successfully complete the project as well as other projects. *See, e.g., Hunter Bros.*, 332 S.E.2d 206.

72.     MCI was the Prime Contractor on the Santee Project and made it known that directives from MCI, not P&J, controlled the project. (Def. Ex. No. 330 ("As the Prime [C]ontractor it is our obligation to ask the tough questions, and communicate with the subcontractor to build this job.").)

73.     The court finds that MCI breached the Subcontract by directing P&J to work in an inefficient manner on the Santee Project. MCI directed P&J to perform work out-of-sequence and must pay for the costs incurred by P&J as a result of doing so. *See, e.g.*, *Advance Iron Works, Inc. v. John Edwards Const. Co.*, Nos. 02-C-0014, 02-C-1152, 2005 U.S. Dist. LEXIS 18066 (N.D. Ill. East. Div. 2004) (contractor paid subcontractor additional money for work done out-of-sequence).

74.     Additionally, the greater weight of the evidence does not support the following affirmative defenses raised by MCI and WSC: (1) release; (2) waiver; (3) prior breach; (4) failure to mitigate; (5) non-performance of conditions precedent; (6) offset; (7) "due to P&J's failure to timely and fully perform its scope of work . . . the full amount of any pending and future liquidated damages attributable to P&J as a defense."; (8) "the penal sum of the payment bond represents the maximum amount that can be recovered from [WSC] . . . ." (ECF No. 18 at 12–14.)

### *iv. Damages Resulting from the Breach*

75.     P&J claims total damages of three million, three hundred forty-four thousand, one hundred seventy-four dollars, and sixty cents ($3,344,174.60) for (1) unpaid contract billings; (2) proof roll rework; (3) inefficiency impact; (4) field overhead costs; and (5) general overhead costs. (Ct. Ex. No. 1; Pl. Ex. No. 135; ECF No. 162-1 at 2.)

76.     In general, in a breach of contract action, the plaintiff may recover any damages that flow from the breach of the contract. *See Hyload, Inc. v. Pre-Engineered Prods., Inc.*, 417 S.E.2d 622, 624 (S.C. Ct. App. 1992).

77.     "The damages recoverable for breach of contract . . . generally include those which follow as a natural consequence of the breach or those which were reasonably within the contemplation of the parties at the time they entered into the contract." *Drews Co. v. Ledwith-Wolfe Assocs., Inc.*, 371 S.E.2d 532 (S.C. 1988) (citing *Gen. Sprinkler Corp. v. Loris Indus. Developer, Inc.*, 271 F. Supp. 551, 557); *see generally* 17A C.J.S. Contracts § 503(a)(1) (1963) (a "reasonable time" for performance is implied where no time therefor is fixed in the building or construction contract).

78.     Damages may include lost production, lost sales, lost rent, and increased financing or carrying costs. *See Nat'l Tire & Rubber Co. v. Hoover*, 122 S.E. 858, 859 (S.C. 1924).

79.     South Carolina courts are silent on the use of the total cost method to calculate a party's damages. Thus, the court must determine whether P&J proved its actual damages with reasonable certainty. *See, e.g.*, *Phillips Const. Co. v. United States*, 394 F.2d 834 (Ct. Cl. 1968). Yet, "[w]hile neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation, proof with mathematical certainty of the amount of loss or damage is not required." *Whisenant v. James Island Corp.*, 281 S.E.2d 794, 796 (S.C. 1981).

80.     Under the total cost method, "the contractor must show: (1) the impracticability of proving actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs." *Servidone Const. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991) (citing *WRB Corp. v. United States*, 183 Ct. Cl. 409, 426 (1968).

81.     The greater weight of the evidence shows that the Tompkins Expert Report is a credible and reliable source of information. (Pl. Ex. No. 135 at 1–41; Trial Tr. at 148–220: Dec. 5.)

82.     In contrast, the Willoughby Expert Report reaches conclusions based on unreliable information, *e.g.*, TI Coastal's survey of the detention ponds that could not account for variables that are found in contemporaneous records like P&J's monthly survey reports. (Pl. Ex. Nos. 310, 387-A–E; Def. Ex. No. 2; Trial Tr. at 111–69: Dec. 19.)

83.     Additionally, there are notable inconsistencies between Willoughby's Expert Reports (*Compare* Pl. Ex. No. 310 at 9–39 *with* Def. Ex. No. 2 at 12–18), including ever-changing quantities (Ct. Ex. Nos. 4, 5; Pl. Ex. Nos. 77, 78, 277, 352 at 35, 46, 59; Trial Tr. "A" at 41–55, 83, 93–95: Jan. 27.)

84.     From March 2018 to October 2019, MCI's total quantity value of Unclassified, Unclassified Ponds, Borrow, and Import increased by one hundred twenty thousand, seven hundred eleven and one-half (120,711.5) cubic yards: (1) On March 2, 2018, five hundred ninety-three thousand, one hundred eleven, and one-half (593,111.5) cubic yards (Pl. Ex. No. 78); (2) On May 20, 2018, and July 10, 2019, five hundred ninety-nine thousand, nine hundred seventy-one (599,971) cubic yards (Ct. Ex. No. 5; Pl. Ex. Nos. 77, 352 at 35); (3) On August 30, 2019, seven hundred thirteen thousand, seven hundred forty-two (713,742) cubic yards (Ct. Ex. No. 5; Pl. Ex. No. 352 at 46); (4) On October 14, 2019, seven hundred thirteen thousand, eight hundred twenty-three (713,823) cubic yards (Ct. Ex. No. 5; Pl. Ex. No. 352 at 59).

85.     In determining the price of each soil category, the court finds that the unit prices within the Subcontract are applicable: (1) Unclassified Excavation at the unit price of four dollars and forty-three cents ($4.43); (2) Unclassified Excavation at the unit price of four dollars and

twenty-seven cents ($4.27); and (3) Borrow Excavation at five dollars and sixty-four cents ($5.64). (Pl. Ex. No. 30 at 2, 135 at 34, 218; Def. Ex. No. 306-A at 3; Trial Tr. at 44: Jan. 29.)

86.     The greater weight of the evidence shows that P&J handled eight hundred ninety-four thousand, one hundred twenty-six (894,126) cubic yards of material, including four hundred eighty-seven, four hundred ninety (487,490) cubic yards of Borrow Excavation, one hundred thirty-four thousand, sixty-six (134,066) cubic yards of Unclassified Excavation from the detention ponds, two hundred twenty-eight thousand, seven hundred seventy-two (228,772) cubic yards of Unclassified Excavation, and forty-three thousand, seven hundred ninety-eight (43,798) cubic yards of material while stripping, stockpiling, and re-spreading topsoil. (Ct. Ex. No. 1.)

87.     The court finds that the evidence and testimony presented at trial shows that P&J is entitled to a total of three million, three hundred forty-four thousand, one hundred seventy-four dollars, and sixty cents ($3,344,174.60) and its calculations are consistent with the Tompkins Expert Report. This total represents the sum of the following amounts: P&J is entitled to one million, nine hundred sixty-three thousand, seven hundred thirty-two dollars, and sixty cents ($1,963,732.60) in unpaid Subcontract billings. (Pl. Ex. No. 135 at 32–34 (citing Pl. Ex. Nos. 5, 199, 362, 391).) P&J is entitled to two hundred twelve thousand, two hundred thirty-seven dollars, and zero cents ($212,237.00) in proof roll rework costs. (*Id.* (citing Pl. Ex. Nos. 271, 362).) P&J is entitled to eight hundred eighty-two thousand, five hundred seventeen dollars, and zero cents ($882,517.00) in inefficient impact costs. (*Id.* at 38–39 (citing Pl. Ex. Nos. 279, 293, 294, 296.) P&J is entitled to one hundred forty-eight thousand, eight hundred eighty-seven dollars, and zero cents ($148,887.00) in field overhead costs. (*Id.* at 40.) Lastly, P&J is entitled to one hundred thirty-six thousand, eight hundred one dollars, and zero cents ($136,801.00) in

general overhead costs. (*Id.*)

### F. P&J's Quantum Meruit or Unjust Enrichment Claim Against MCI

88.     P&J brought an alternative claim for relief of Quantum Meruit against MCI in its Amended Complaint. (ECF No. 11 at 12–13 ¶¶ 84–90.)

89.     However, P&J withdrew the claim in its Response to MCI's Motion for Partial Summary Judgment: "MCI moves for summary judgment on P&J's quantum meruit claim on the grounds that P&J's Complaint claimed, and MCI's Answer admitted, that the Subcontract is a valid contract. P&J agrees that because the validity of the Subcontract is not in dispute, the quantum meruit claim may be dismissed[.]" (ECF No. 92 at 23.)

90.     At trial, P&J sought to reassert the second cause of action against MCI. (Trial Tr. "A" at 8–9: Jan. 27.)

91.     Rule 15 of the Federal Rules of Civil Procedure governs P&J's attempt to add this claim after the Amended Complaint has been filed.

92.     Specifically, Rule 15(b) authorizes amendment of the pleadings to conform to issues that do not "prejudice [the opposing] party's action or defense on the merits." Fed. R. Civ. P. 15(b). "Prejudice occurs when the amendment states a new claim or defense which would require the opposing party to introduce additional or different evidence to prevail in the amended action." *Ball v. Canadian Am. Exp. Co.*, 442 S.E.2d 620, 622 (S.C. Ct. App. 1994) (citing *S.C. State Highway Dept. v. Rural Land Co.*, 156 S.E.2d 333 (S.C. 1967).

93.     The court finds P&J's amendment to be prejudicial because MCI was unable to present evidence in defense to the previously withdrawn cause of action.

94.     Therefore, the court need not provide an analysis for P&J's second cause of action.

### G. P&J's Claim for Violation of South Carolina Prompt Pay Act Against MCI

95.     P&J claims that MCI violated the South Carolina Prompt Pay Act, S.C. Code Ann. § 29-6-30, *et seq.* (West 2020), by "failing to make timely and prompt payment to P&J under the Subcontract despite P&J's delivery to MCI of timely pay applications and invoices and payment by SCDOT to MCI for the work and extra work performed and inefficiency impact damages incurred by P&J." (ECF No. 11 at 13–14 ¶¶ 91–95.)

### i. Legal Standard

96.     Under South Carolina law, "[w]hen a contractor or a subcontractor has performed in accordance with the provisions of his contract, the owner shall pay . . . within twenty-one days of receipt by the owner of any pay request based upon work completed or service provided under the contract." S.C. Code Ann. § 29-6-30 (West 2020). If a payment is wrongly withheld, then a party may recover interest on the unpaid balance and attorney's fees. *Id.*

### ii. Existence of Contract

97.     South Carolina defines a contract as "an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct." *Gaskins*, 486 S.E.2d at 773.

98.     Here, the parties do not dispute that the Subcontract is a valid contract between P&J and MCI. (Pl. Ex. No. 30.)

### iii. Breach of Contractual Obligation

99.     "A breach of contract is defined as a violation of contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance." *Parco Merged Media Corp. v. Multispectral Sols., Inc.*, No. 2:06-cv-46, 2006 U.S. Dist. LEXIS 29453, at *25 (E.D. Va. Apr. 21, 2006) (internal quotation marks omitted).

100.     The greater weight of the evidence shows that MCI failed to timely pay P&J for its

work on the Santee Project and therefore violated the South Carolina Prompt Pay Act. (Pl. Ex. No. 220.)

### iv. Damages Resulting from the Breach

101.    The court finds that, because MCI breached the Subcontract, P&J is entitled to damages for MCI's violation of the South Carolina Prompt Pay Act.

### H.  P&J's Claim for Breach of Payment Bond Against MCI and WSC

102.    P&J asserts that it "complied with its obligations under the payment bond[,] more than ninety [90] days have passed since P&J's last date of supplying work, labor, or materials to the [Santee] Project]" without payment in full, and it sent notice of its demand for payment to WSC. (ECF No. 11 at 15 ¶ 108–110.) Specifically, P&J claims that WSC is jointly and severally liable for MCI's breach of the Subcontract and therefore "is obligated . . . to pay P&J for the work, labor, and materials it provided in performing its scope of work under the Subcontract, which directly supported the work performed under the Prime Contract, and for which MCI failed to make payment." (*Id.* at ¶ 107.)

### i. Legal Standard

103.    In South Carolina, "a contractor and the surety on his bond, given to secure payment for labor and materials furnished in the construction of a public improvement, whether the bond be required by statute or not, are liable not only for labor and materials furnished to the contractor, but also for those furnished to a subcontractor." *Dominion Culvert & Metal Corp. v. United States Fid. & Guar. Co.*, 120 S.E.2d 518, 520 (S.C. 1961) (citing *Molony & Carter Co. v. Pennell & Harley*, 169 S.E. 283 (S.C. 1933)).

### ii. Existence of Contract

104.    South Carolina defines a contract as "an obligation which arises from actual

agreement of the parties manifested by words, oral or written, or by conduct." *Gaskins*, 486 S.E.2d at 773.

105.    The parties do not dispute that the payment bond agreement is a valid contract between MCI and WSC. (Pl. Ex. No. 30; ECF No. 1-2 at 1–4.)

### iii. Breach of Contractual Obligation

106.    "A breach of contract is defined as a violation of contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance." *Parco Merged Media Corp. v. Multispectral Sols., Inc.*, No. 2:06-cv-46, 2006 U.S. Dist. LEXIS 29453, at *25 (E.D. Va. Apr. 21, 2006) (internal quotation marks omitted).

107.    Here, P&J notified Defendants of its claims arising from the Santee Project, but Defendants did not pay P&J. (Pl. Ex. No. 379; Def. Ex. No. 111.)

### iv. Damages Resulting from Breach

108.    The court finds that, because MCI breached the Subcontract, P&J is entitled to damages for MCI's breach of payment bond. (*See* ECF No. 1-2 at 2 ("[MCI] and [WSC], jointly and severally, bind themselves . . . to pay for labor, materials, and equipment furnished for use in the performance of the Construction Contract.").)

### I.    P&J's Claim for Recovery of Attorney's Fees Against MCI and WSC

109.    P&J asserts that Defendants are liable for reasonable attorney's fees and interest "for improvement of real estate." (ECF No. 11 at 14–15 ¶¶ 96–105.)

### i. Legal Standard

110.    Under South Carolina law:

Whenever a contractor, laborer, design professional, or materials supplier has expended labor, services, or materials under contract for the improvement of real property, and where due and just demand has been made by certified or registered mail for payment for the labor, services, or materials under the terms of any

regulation, undertaking, or statute, it is the duty of the person upon whom the claim is made to make a reasonable and fair investigation of the merits of the claim and to pay it, or whatever portion of it is determined as valid, within forty-five days from the date of mailing the demand. If the person fails to make a fair investigation or otherwise unreasonably refuses to pay the claim or proper portion, he is liable for reasonable attorney's fees and interest at the judgment rate from the date of the demand.

S.C. Code Ann. § 27-1-15 (West 2020).

### ii. Existence of Contract

111.    South Carolina defines a contract as "an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct." *Gaskins*, 486 S.E.2d at 773.

112.    Here, the parties do not dispute that the Subcontract is a valid contract between P&J and MCI. (Pl. Ex. No. 30.)

### iii. Breach of Contractual Obligation

113.    "A breach of contract is defined as a violation of contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance." *Parco Merged Media Corp. v. Multispectral Sols., Inc.*, No. 2:06-cv-46, 2006 U.S. Dist. LEXIS 29453, at *25 (E.D. Va. Apr. 21, 2006) (internal quotation marks omitted).

114.    The greater weight of the evidence shows that Defendants failed to pay P&J as required by the Subcontract. (Pl. Ex. No. 30.)

### iv. Damages Resulting from the Breach

115.    On December 1, 2019, the parties filed a "Joint Stipulation Regarding Claims for Attorney['s] Fees" that provides:

The parties request that the [c]ourt defer ruling on any issues as to the entitlement and amount of attorney['s] fees incurred by either Party, including the reasonableness of attorney['s] fees, until after the conclusion of the trial and the [c]ourt's entry of its judgment on the parties' contract and bond claims, other than

those related to attorney['s] fees. The parties request that only evidence as to the amount of attorney['s] fees incurred or requested be addressed by post-judgment motions, including post-trial hearings if the [c]ourt so wishes.

(ECF No. 131 at 1–2 ¶ 4; Trial Tr. at 19: Dec. 2.)

116.    As such, the court need not further address this claim as to the amount of attorney's fees.

### J.    MCI's Claim for Breach of Contract Against P&J

117.    MCI asserts that P&J materially breached the following "express and implied" terms of the Subcontract: (1) "failing to adequately staff, equip, and manage its work on the Project"; (2) "failing to keep ponds pumped down; mismanagement of its work, including premature abandonment of Pond 1"; (3) "failing to utilize proper equipment to facilitate soil drying and stabilization"; (4) "demobilizing prior to completing its scope of work"; (5) "refusing to return to correct its defective work and/or complete its work"; (6) "failing to timely complete its work in accordance with project schedules"; (7) "failing to aid in McCarthy's ongoing efforts to secure time extensions from SCDOT"; (8) "performing defective work that had to be corrected by McCarthy at its own expense"; (9) "overbilling for its work"; and (10) "other breaches." (ECF No. 18 at 17–18 ¶¶ 15–18.)

*i. Legal Standard*

118.    To recover for a breach of contract, a party must prove: (1) a binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damage suffered by the plaintiff as a direct and proximate result of the breach. *See Fuller*, 124 S.E.2d at 610; *see also Cummins Atl., Inc.*, 852 F. Supp. at 1286 (the "plaintiff bears the burden of establishing the existence and terms of the contract, defendant's breach of one or more of the contractual terms, and damages resulting from the breach.").

### ii. Existence of Contract

119.    In South Carolina, a contract is defined as "an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct." *Gaskins*, 486 S.E.2d at 773.

120.    Here, the parties do not dispute that the Subcontract is a valid contract between P&J and MCI. (Pl. Ex. No. 30.)

### iii. Breach of Contractual Obligation

121.    "A breach of contract is defined as a violation of contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance." *Parco Merged Media Corp. v. Multispectral Sols., Inc.*, No. 2:06-cv-46, 2006 U.S. Dist. LEXIS 29453, at *25 (E.D. Va. Apr. 21, 2006) (internal quotation marks omitted).

### a. First Breach – Delay

122.    Article One requires P&J to "adhere to and be bound by all the requirements of the General Contract." (Pl. Ex. No. 30 at 1.)

123.    Article Five states that P&J "agrees that any decision, interpretation, or determination of the said General Contract by said OWNER binding upon the CONTRACTOR, shall be binding also on the SUBCONTRACTOR." (Pl. Ex. No. 30 at 3.)

124.    Article Six required P&J to "diligently prosecute and complete the said work as rapidly as the CONTRACTOR shall judge that the progress of the work will permit[.]" (Pl. Ex. No. 30 at 3.)

125.    Article Twelve required P&J to "prosecute the work at all times in such manner as the CONTRACTOR may regard as best calculated to coordinate with the work of the

CONTRACTOR . . . [and] [t]he Subcontractor must not commit or permit any act or omission which might interfere with the performance of work by any other entity." (Pl. Ex. No. 30 at 6.)

126.    The greater weight of the evidence shows that MCI failed to provide an adequate production schedule as required by Article Six of the Subcontract. (Pl. Ex. No. 30 at 3 ("The SUBCONTRACTOR shall complete the several portions, and the whole of the work comprehended in the Agreement by and at the time or times hereinafter stated, to wit: In accordance with the CONTRACTOR'S approved progress schedule, which is contingent upon a forthcoming production schedule mutually agreed upon by both parties.").)

127.    It is standard in the construction industry to use a valid, logically consistent, and accurate CPM schedule to plan and manage the construction of a project. (Trial Tr. at 113: Dec. 5; Trial Tr. at 12: Jan. 27; Trial Tr. "B" at 21: Jan. 30.)

128.    The greater weight of the evidence shows that the Draft CPM Schedule was not a schedule authorized by SCDOT pursuant to the Prime Contract. (*Compare* Pl. Ex. No. 59 *with* Pl. Ex. No. 308.)

129.    The greater weight of the evidence suggests that MCI did not ensure P&J was made fully aware of the Draft CPM Schedule and resulting deadline attributable to P&J. Instead, MCI Project Manager David Boyer testified that he simply hung the schedule on the wall in his construction trailer. (Trial Tr. "A" at 65–66: Jan. 29.)

130.    P&J did not receive the Draft CPM Schedule until July 2015, which is approximately nine months after MCI Executive Vice President Ron Sines emailed it to P&J Superintendent Joe Ledford. (Def. Ex. No. 219.)

131.    There is no basis for MCI's claim that the Draft CPM Schedule emailed to P&J Project Superintendent Joe Ledford complied with the Subcontract because Mr. Ledford did not

have the authority to accept or modify the Subcontract. (Pl. Ex. Nos. 59, 194 at 4; Trial Tr. at 44: Dec. 19.)

132.    It is an industry standard to supply an updated monthly schedule to all subcontractors on-site and to the authorized officers of the subcontractor. (Trial Tr. at 154–72: Dec. 5.) This updated schedule should have been discussed in the weekly project meeting attended by the prime contractor and subcontractors. (Trial Tr. "A" at 56: Jan. 29.)

133.    At the heart of any construction project is a concise, logical schedule that clearly identifies critical paths. Equally important is the monthly updates to that schedule so that it continues to reflect the reality of the project's progress, or lack thereof. *See, e.g.*, *Chaney & James Const. Co., Inc. v. United States*, 421 F.2d 728, 740–41 (Cl. Ct. 1970) (explaining that a CPM schedule should represent a feasible and reasonable plan for performance and be utilized during construction). The greater weight of the evidence proves that the project schedules generated by MCI lack those key components.

134.    It is readily apparent that MCI did not allow enough time on the "front end" or Design phase of the Santee Project. In short, MCI used days meant for the "Build" phase in its attempt to design a project that SCDOT would approve. (Pl. Ex. No. 214 at 7.)

135.    P&J was entitled to rely on the progress schedule prepared by the general contractor and approved by the owner. *See, e.g.*, *Hunter Bros.*, 332 S.E.2d 206. However, because the Draft CPM Schedule did not accurately reflect the project milestones or completion dates, the court finds that P&J was only required to perform its duties within a reasonable time. *See Ledwith-Wolfe*, 371 S.E.2d at 533 ("Where a contract sets no date for performance, time is not of the essence of the contract and it must be performed within a reasonable time."); *see generally* 17A C.J.S. Contracts § 503(a)(1) (1963) ("[A] 'reasonable time' for performance is implied where no

time [is] fixed in building or construction contract.").

136.    P&J's equipment and manpower on-site is governed by Article Six of the Subcontract, which contains a condition precedent that demands a mutual agreement regarding the "production schedule" P&J would use to assess the means and methods to execute the Subcontract. (Pl. Ex. No. 30 at 3 ("In accordance with [MCI's] approved progress schedule [by SCDOT], *which is contingent upon a forthcoming production schedule mutually agreed upon by both parties.*").) However, the greater weight of the evidence suggests that MCI failed to deliver a production schedule to P&J specifying the various roles and responsibilities for nine months. (Pl. Ex. Nos. 59, 194; Trial Tr. "A" at 85–87: Jan 29; Trial Tr. at 34–36: Dec. 19.)

137.    Even if MCI provided the appropriate P&J officers with the Draft CPM Schedule as P&J mobilized to the Santee Project, P&J's assessment of manpower and equipment would have been based on inaccurate information. (Pl. Ex. No. 59.) As the negative float built up, the only way P&J could maintain progress in the Draft CPM Schedule would have been to add additional resources to the project. Without an approved schedule containing clear and achievable milestones, it was unlikely that P&J would have increased its resources and costs. (Trial Tr. "B" at 57: Jan. 27.)

138.    MCI remained silent, inattentive, and withheld information despite P&J's repeated requests for a production schedule. (Pl. Ex. No. 194 at 4; Trial Tr. at 38–40: Dec. 19.)

139.    A reasonable subcontractor would not sign a contract with a schedule that it is behind schedule before it mobilized to site, *i.e.*, one hundred forty-nine (149) negative float. (Pl. Ex. No. 59 at 2–7.)

140.    MCI's critical path schedules that it sent to SCDOT showed that the earthwork on the Santee project was delayed on a monthly basis. (Pl. Ex. No. 310 at 15.)

141.    MCI knew that the Santee Project was behind schedule in the initial stages of the project and that it did not have the expertise for the dirt work. (*See, e.g.*, Pl. Ex. No. 59 (showing P&J scheduled to begin working seven days a week until completion); ECF No. 161 ("[MCI] paid a [] premium over its estimated cost to self-perform the work subcontracted to P&J because [MCI] knew that P&J had the capability of performing the time critical dirt work on [the] [p]roject . . . [MCI thought it was assuring the success of [the] [p]roject when it hired P&J.").)

142.    The greater weight of the evidence does not show that P&J was responsible for delays on the project and does not support MCI's assertion that P&J assumed the risk of paying liquidated damages based on the deadlines and milestones within a Draft CPM Schedule it received nine months after mobilizing to the Santee Project. (Pl. Ex. Nos. 59, 194 at 4; Trial Tr. at 38–40: Dec. 19.)

143.    The greater weight of the evidence shows that the Santee Project suffered from extraordinary weather-related delays, (Pl. Ex. No. 388-J ("As in the fall of 2015, this project continued to be hampered by Acts of God and floods in 2016")), which do not negatively impact a project schedule. *See Woodruff v. Thomas*, 29 S.C.L. 148, 150 (S.C. App. L. 1843) ("The act of God never prejudices anyone.")

144.    Moreover, P&J's "reasonable time" to complete the work was constantly altered as MCI interfered with its progress. (Pl. Ex. Nos. 29, 51, 214.) MCI cannot shift its blame for its mistakes to P&J in order to salvage its  costs and reputation. (Def. Ex. No. 2 at 17.)

145.    P&J did not cause delays that amount to a breach of the Subcontract and is therefore not liable to MCI for liquidated damages.

b.    <u>Second Breach – Overbilling</u>

146.    MCI asserts that P&J breached the Subcontract by "overbilling" work on the Santee

Project. (ECF No. 161 at 3.) Specifically, MCI claims that the quantities of dirt that P&J handled on the Santee Project are not consistent with the requirements for the project. (*Id.*)

147.    "To recover for breach of contract accompanied by a fraudulent act, a plaintiff must show: (1) a breach of contract; (2) fraudulent intent relating to the breach of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach." *Greene v. Quest Diagnostics Clinical Labs., Inc.*, 455 F. Supp. 2d 483, 495 (D.S.C. 2006) (citing *Harper v. Ethridge*, 348 S.E.2d 374, 378 (S.C. Ct. App. 1986); *Floyd v. Country Squire Mobile Homes, Inc.*, 336 S.E.2d 502 (S.C. Ct. App. 1985)) (internal quotation marks omitted).

148.    MCI offered no meaningful evidence to demonstrate that P&J fraudulently "overbilled" for work on the Santee Project. *United States ex rel. Endicott Constructors Corp. v. E. Amanti & Sons, Inc.*, 2017 U.S. Dist. LEXIS 110485 n.166 (D. Mass. June 1, 2017) (explaining that it is not the court's duty to scour the record to support a party's claim).

149.    As a result, the court finds that P&J did not breach the Subcontract by overbilling for work on the Santee Project.

### c.    Third Breach – Failure to Complete Scope of Work

150.    MCI notified P&J that it would be "moving forward by completing the punch list items that ordinarily would be the responsibility of [P&J] . . . [p]ursuant to Article Seven of the parties' subcontract, [MCI] will [charge] P&J for completing these items." (Def. Ex. No. 85.)

151.    Abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction. *See Quality Concrete Prods., Inc. v. Thomason*, 72 S.E.2d 297 (1970). An abandonment of a contract need not be express but may be inferred from the conduct of the parties and the attendant circumstances. *Id.*

152.    "There is an obligation to mitigate damages regardless of who the breaching party

is . . . [t]his principle is commonly called the doctrine of avoidable consequences." *See, e.g.*, *Tri-Cont'l Leasing Corp. v. Stevens, Stevens & Thomas, P.A.*, 338 S.E.2d 343 (S.C. Ct. App. 1985); *see also* Restatement (Second) of Contracts § 350 cmt. D, illus. 9. Generally, "a party cannot recover damages for losses that he could have avoided by reasonable efforts. Once a party has reason to know the other party will not be performing their obligations under the contract, the non-breaching party is ordinarily expected to stop his own performance to avoid further expenditure." *Id.*

153.    MCI failed to proffer credible evidence, *i.e.*, authenticated photographs, that it performed work that P&J did not complete, and that it mitigated damages through reasonable efforts. (Def. Ex. No. 470) The greater weight of the evidence shows that P&J completed its entire scope of work under the Subcontract prior to demobilizing. (Pl. Ex. Nos. 12, 30, 275, 276, 400.)

154.    Even if P&J demobilized before finishing its scope of work, MCI's interference and refusal to pay P&J justified an abandonment of the Santee Project.

155.    Therefore, P&J did not breach the Subcontract by failing to complete its scope of work when it demobilized from the Santee Project.

d.    Fourth Breach – Modified Contract

156.    Article Sixteen provides: "No contemporaneous or subsequent conversation or writing will have any force or effect to modify this Agreement unless reduced to a writing signed by an authorized representative of each party." (Pl. Ex. No. 30 at 7.)

157.    In South Carolina, "[w]ritten contracts may be modified orally." *S.C. Nat'l Bank v. Silks*, 367 S.E.2d 421, 422 (S.C. Ct. App. 1988).

158.    A written contract may be modified by oral agreement even if the contract expressly states that all changes must be in writing. *See Koontz v. Thomas*, 511 S.E.2d 407, 411 (S.C. Ct.

App. 1999).

159.    South Carolina law requires that "[a]ny modification of written contract must satisfy all requisites of valid contract." *Bishop Realty and Rentals, Inc. v. Perk, Inc.*, 355 S.E.2d 298, 300 (S.C. Ct. App. 1987), *cert. denied*, 362 S.E.2d 26 (S.C. 1987).

160.    "In order to have a valid and enforceable contract, there must be a meeting of the minds between the parties with regard to all essential and material terms of the agreement." *Player v. Chandler*, 382 S.E.2d 891, 893 (1989) (citing *Hughes v. Edwards*, 220 S.E.2d 231 (1975)).

161.    "It is well settled in South Carolina that in order for there to be a binding contract between parties, there must be a mutual manifestation of assent to the terms." *Laurel Hill*, 247 S.E.2d at 436 (citation omitted). The parties must manifest their mutual assent to all essential terms of the contract in order for an enforceable obligation to exist. *Id*.

162.    "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Carolina Amusement Co., Inc. v. Conn. Nat'l. Life Ins. Co.*, 437 S.E.2d 122 (S.C. Ct. App. 1993), *reh'g denied*, (Aug. 2, 1993) (citing Restatement (Second) of Contracts, § 24 (1981)).

163.    "Valuable consideration may consist of some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered, or undertaken by the other." *McPeters v. Yeargin Const. Co.*, 350 S.E.2d 208, 211 (S.C. Ct. App. 1986).

164.    "One receiving an offer to change a contract to which he is a party is held to be under no obligation to respond to it, and his silence cannot be construed as an acceptance where nothing else is shown." *H.A. Sack Co. v. Forest Beach Public Service Dist.*, 250 S.E.2d 340

(1978); *Raysor v. Berkley Co. Ry. & Lumber Co.*, 2 S.E. 119 (1887); *Florence City-Cnty. Airport Comm'n v. Air Terminal Parking Co.*, 322 S.E.2d 471, 473 (S.C. Ct. App. 1984).

165.    If the terms of an offer do not require acceptance to be expressed in words, then acceptance can be inferred from acts and conduct that manifest acceptance. *See Ex parte Stevens, Stevens & Thomas, P.A.*, 283 S.E.2d 444 (S.C. 1981), overruled on other grounds by *Lester v. Dawson*, 491 S.E.2d 240, *reh'g den.* (Oct. 10, 1997); *see also Sadighi v. Daghighfekr*, 66 F. Supp. 2d 752 (D.S.C. 1999) ("Offer and acceptance can be inferred from the parties' course of conduct.")

166.    If one of the parties has not agreed, then a prerequisite to formation of the contract is lacking. *See Shealy v. Fowler*, 188 S.E. 499, 502 (S.C. 1936).

167.    Importantly, "agreements to agree do not amount to a contract in South Carolina." *Blanton Enter., Inc. v. Burger King Corp.*, 680 F. Supp. 753, 770 n.20 (D.S.C. 1988); *see also Laurel Hill*, 247 S.E.2d at 436.

168.    The greater weight of evidence shows that P&J did not agree to a contract modification and that P&J did not sign MCI's letter that would establish that the companies had agreed to split the cost of the off-site material. (Def. Ex. No. 59, 296; Pl. Ex. No. 213 ("Apparently I was wrong about Teddy and Joe reaching an agreement. I apparently misheard what I thought Joe said.").)

169.    The evidence does not reveal any documentation of an agreement to split the cost of off-site borrow, *e.g.*, an invoice, generated after meetings between MCI and P&J. (Pl. Ex. Nos. 219, 371; Trial. Tr. "A" at 66: Jan. 31.)

170.    The evidence and testimony presented at trial revealed, at most, a "possibility" of an agreement to split the costs of off-site soil. (Trial Tr. "B" at 5: Jan. 29; Trial Tr. "A" at 66, 104:

Jan. 31.) All subcontractors want to be team players for the benefit of a construction project. Yet, a subcontractor's fundamental interest is to make money. P&J would have accrued no tangible benefit by paying for half the imported soil, except that of escaping a failing project sooner.

171.    Therefore, the court finds that P&J and MCI did not agree to modify the contract in order to split the costs for the off-site soil.

*iv. Damages Resulting from the Breach*

172.    Defendants claim damages totaling four million, one hundred eighty-two thousand, seven hundred eighty dollars, and ninety-seven cents ($4,182,780.97). (ECF No. 161-1 at 2.)

173.    P&J did not breach a "gentleman's agreement" to cover half the cost of the off-site borrow. Because the court finds that P&J did not breach the Subcontract, MCI is not entitled to recover damages from P&J.

## V. CONCLUSION

For the reasons stated herein, the court finds that judgment shall be entered in favor of Plaintiff Phillips and Jordan, Inc. on its claims for (1) Breach of Contract, (2) Violation of South Carolina's Prompt Pay Act, (3) Recovery of Attorney's Fees and Interest for Improvement of Real Estate, and (4) Breach of Payment Bond against Defendant McCarthy Improvement Company, as well as (1) Recovery of Attorney's Fees and Interest for Improvement of Real Estate and (2) Breach of Payment Bond against Defendant Western Surety Company.

The court hereby allocates damages to P&J in the amount of three million, three hundred forty-four thousand, one hundred seventy-four dollars, and sixty cents ($3,344,174.60) from Defendants. This total represents the sum of the following amounts: one million, nine hundred sixty-three thousand, seven hundred thirty-two dollars, and sixty cents ($1,963,732.60) in unpaid Subcontract billings; two hundred twelve thousand, two hundred thirty-seven dollars, and zero

cents ($212,237.00) in proof roll rework costs; eight hundred eighty-two thousand, five hundred seventeen dollars, and zero cents ($882,517.00) in inefficient impact costs; one hundred forty-eight thousand, eight hundred eighty-seven dollars, and zero cents ($148,887.00) in field overhead costs; and one hundred thirty-six thousand, eight hundred one dollars, and zero cents ($136,801.00) in general overhead costs.

The court observes that Defendants' liability is joint and several based on their contractual agreement, (ECF No. 1-2 at 2 ("[MCI] and [WSC], jointly and severally, bind themselves . . . to pay for labor, materials, and equipment furnished for use in the performance of the Construction Contract")), and orders MCI to make payment to P&J within thirty (30) days of the conclusion of this litigation.

Moreover, pursuant to the Joint Stipulation regarding Recovery of Attorney's Fees and Interest for Improvement of Real Estate, P&J shall submit evidence in post-judgment motions as to the amount of attorney's fees, costs, and interest requested. (ECF No. 131 at 1–2.)

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

September 29, 2020
Columbia, South Carolina